566 So.2d 1172 (1990)
ANDREW JACKSON LIFE INSURANCE COMPANY
v.
Willie L. Williams.
No. 07-CA-58758.
Supreme Court of Mississippi.
July 25, 1990.
*1173 Christy D. Jones, Stevenson Ray, Butler Snow O'Mara Stevens & Cannada, Jackson, for appellant.
*1174 Michael B. McMahan, McMahan & McMahan, Hattiesburg, for appellee.
Before DAN M. LEE, P.J., and PRATHER and BLASS, JJ.
PRATHER, Justice, for the Court:
I. INTRODUCTION

[Once again, this Court is] called upon to redress grievances which [might have been] avoided by proper state regulation of insurance company practices.[1]
The primary issue addressed in the case sub judice is whether the insurer, Andrew Jackson Life Insurance Company, should be held accountable for its agents' allegedly "unauthorized" misrepresentations of insurance policy provisions and conditions. In the Hinds County Circuit Court, a jury answered the question in the affirmative and returned a verdict against the company in the amount of $28,000 in compensatory damages and $200,000 in punitive damages. The verdict is affirmed.
In Section I of this opinion, the events which preceded the filing of this appeal are delineated  followed (in Section II) by an analysis of the issues presented. This analysis leads to the ultimate conclusion in Section III  that the jury's verdict was proper.
Finally, no issues pertaining to the constitutionality of the punitive-damages award were raised at trial nor presented on appeal.[2] Accordingly, this Court's scope of review is limited.

A. Factual Background
In the fall of 1984, Al Page and David Smith, agents for Andrew Jackson Life Insurance Company ("Andrew Jackson"), met with numerous company officials at Universal Manufacturing Company ("Universal") in Mendenhall, Mississippi. The meetings with the officials were scheduled for the purpose of securing permission to offer interested Universal employees a "unique," "local" product contrived by Andrew Jackson. The agents explained that purchasers of the product would receive allegedly "better" coverage than that provided by American Income Insurance Company ("American Income"), which issued the policies then-held by many employees (including the appellee, Willie Williams).
More specifically, the agents explained that what they were offering was not an ordinary life insurance policy; rather, it was a "supplemental retirement program with a death benefit" and an "immediate cash benefit plan" containing a $1,000 "check"[3] which, in the event of an insured's death, could be cashed immediately to pay for such burdensome expenses as funeral arrangements. Of critical significance, the agents assured that employees who decide to enroll in Andrew Jackson's retirement program: (1) could allow their current policies to lapse, and (2) would be covered (insured) "immediately" and unconditionally upon completing an application and "upon signing ... the[ir] payroll deduction card." In essence, the agents guaranteed all-important "risk aversion"[4] *1175 and "peace of mind."[5] This was critical to those who were currently insured and were concerned about being without risk aversion and peace of mind once they allowed their policies to lapse.[6]
Based on the information the agents provided, permission to offer their retirement program was granted. With their "foot in Universal's door," the aggressive agents incurred no difficulty in persuading Universal employees to "lend an ear." As employees passed through clock alley,[7] their attention was captured by an array of alluring wares displayed on the table. These wares included televisions, radios, money, and teddy bears, and were provided as door prizes (i.e., "gimmicks")  which anyone willing to stop and listen to the agents' offers could win. Basically, the offers included the same information conveyed during meetings with company officials.
Willie Williams, a forklift operator at Universal, was one of the many who were persuaded to sign his payroll-deduction card and to drop his American Income policy through guarantees of immediate "enrollment" in Andrew Jackson's "retirement program." Notably, the application was filled out by an agent as Willie and his wife, Jerlean responded to questions. Upon completing the transaction, the agents told Willie that he could "pick [his] policy up within two to three at the plant." But several weeks passed, and Willie had not received his policy as promised. On February 11, 1985, Jerlean died of a heart attack. Willie again inquired if his policy had arrived  "because [he] needed the $1,000" check from the immediate cash benefit plan "to pay for funeral arrangements." And once again, the reply was: "[I]t [will] probably be in this week[; j]ust check back [later]."
The policy never arrived; instead, Andrew Jackson executives attempted to induce Willie to settle for $1,000 and to sign a release which would have relinquished his rights to receive the full amount of benefits due him under his policy. Willie refused to settle, to which one company executive admonished: "[I]f you don't take this, you might ... get nothing." But Willie, adamant in his refusal to settle, rationalized: "I'm in a bind, but, my God"  "compared to the [death benefits I contracted for] this thousand dollars is nothing ... *1176 [and] I just as soon to do without it." Restated, Willie felt that Andrew Jackson was trying to take advantage of him and use his financial dire straits to compel him to settle. And in light of his heavy financial burdens, accepting the $1,000-settlement offer would hardly make a difference; therefore, he'd rather than "leave it" than "take it." It was simply a matter of principle.
On May 3, 1985, Andrew Jackson mailed Willie a letter officially denying his claim for the death benefits. Andrew Jackson provided the following logic for its denial: (1) Willie applied for a policy which expressly declares it "will not take effect until it has been delivered" and ... until the first premium has been paid ... while the ... Insureds are alive ... and ... prior to any change in health as shown in the application"; (2) The underwriting process was ongoing when Jerlean died, therefore, a contract had not been formed and an actual policy delivered; (3) The underwriting process nonetheless continued, and was eventually completed; and (4) Based on the information adduced during the underwriting process, Jerlean was determined to be "uninsurable" because she had a heart condition which was undisclosed. Andrew Jackson concluded its letter by noting: "Since we are unable to accept your application, we are returning [seven premiums in] the amount of $76.44 which ha[ve] been paid" by your employer through payroll deductions.
Willie attempted to avert litigation. He informed Andrew Jackson that, prior to Jerlean's death, its agents unequivocally formed a contract with him  notwithstanding Jerlean's disclosure to the agents that she had a heart condition. In essence, Willie contended that Andrew Jackson was accountable for any misrepresentations which they may have made to him regarding policy conditions or to it their principal regarding Jerlean's health. Willie's attempt was to no avail.

B. The Suit
On August 26, 1986, Willie filed a complaint at the Hinds County Circuit Court, and contended that he contracted with authorized agents of Andrew Jackson for immediate enrollment in the "retirement program" and, that the insurer breached its "contractual obligations" by denying his claim  and for "no logical, arguable reason." Willie also contended the breach was "prompted by willful and conscience [sic] wrong or by actual malice and fraud or by conduct so grossly negligent and inexcusable" that he is entitled to compensatory damages in the amount of $27,705, and to punitive damages "in the sum of $250,000" (punitive), in addition to costs and interest.
Andrew Jackson countered that conditions of insurability were not met in Willie's case, that it formed no contract with Willie, that its agents are limited to mere solicitation of applications, and that none of its agents is authorized to waive existent conditions or to form binding contracts on its behalf. Therefore, Andrew Jackson concluded that it cannot be held responsible for "any and all wrongful acts" of its agents.
During the course of the trial, Andrew Jackson twice moved for a directed verdict; the motions were denied. After three days of lengthy testimony, the jury returned a verdict in favor of Willie for $28,000 in compensatory damages and $200,000 in punitive damages. Andrew Jackson subsequently and unsuccessfully moved for j.n.o.v. and, alternatively, for a new trial. The motion was denied. Andrew Jackson appealed.

II. ANALYSIS
Eight issues were presented for resolution and are addressed, without specific reference, in the following sections.

A. Propriety of Compensatory-Damages Award
The propriety of the jury's award of $28,000 is determinable upon resolution of whether an actual contract was formed between Andrew Jackson's agents and Willie, and whether Andrew Jackson should be bound by the formed contract. Before addressing these issues, discussion of the *1177 standard applicable to this Court's review of the jury's finding is in order.
Formation of an insurance contract must be proved by clear and convincing evidence. Mississippi Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 928-29 (Miss. 1986). And whether a contract was formed is an issue for the fact-finder to resolve. Id. at 929; McPherson v. McLendon, 221 So.2d 75, 79 (Miss. 1969). In the case sub judice, the jury resolved the issue against Andrew Jackson, and awarded Willie the amount of the contract (i.e., policy). Regarding this and other issues (discussed in subsequent subsections of this opinion), Andrew Jackson requested a j.n.o.v. and, alternatively, a new trial.
Whe[n] a motion for j.n.o.v. has been made, the trial [judge] must consider all evidence in the light most favorable to the non-movant, who must also be given the benefit of all favorable inferences that may be reasonably drawn from the evidence; if the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men [sh]ould not have arrived at [the] verdict [rendered in favor of the non-movant], granting the [motion for j.n.o.v.] is required; on the other hand, if there is substantial evidence opposed to the motion, i.e. evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand.
Maxwell v. Illinois Cent. Gulf R.R., 513 So.2d 901, 904-905 (Miss. 1987) (quoting Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984), and citing numerous authorities). A motion for a new trial, on the other hand, is addressed to the trial judge's sound discretion. Jesco, Inc. v. Whitehead, 451 So.2d 706, 714-15 (Miss. 1984) (Robertson, J., specially concurring).
Presiding Judge Francis Bowling denied Andrew Jackson's motion. Andrew Jackson of course contends the denial was erroneous. In addressing the insurer's contention, this Court must bear in mind the guideline which a trial judge follows in denying or granting a j.n.o.v. or new-trial motion. In so doing, deference will be accorded the judge's determination of whether a jury issue was tendered. Deference will also be accorded the jury's fact-finding because of its position  unlike this Court's  to evaluate and weigh the truthfulness of a witness' testimony.
The demeanor or bearing of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject.
Traveler's Indemnity Co. v. Rawson, 222 So.2d 131, 134 (Miss. 1969); see Wells Fargo Armed Serv. Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1989); Bruner v. University of Southern Miss., 501 So.2d 1113, 1116 (Miss. 1987).

1. Whether a Contract Was Formed: Overview of the Law
As a preliminary step to resolving the primary issue of whether a contract was formed, a cursory examination of the type of bargaining (or marketing) transaction which Andrew Jackson's agents employed is necessitated. The evidence is then scrutinized to determine whether the elements of a contract (i.e., offer, acceptance, and consideration) are present.

a. The Bargaining Transaction
Bargaining transactions with potential insureds are generally conducted by the insurer's agents. Through these transactions, the agent may invite the potential insured to make an offer (i.e., to become an applicant for coverage). See generally R. KEETON & A. WIDISS, INSURANCE LAW § 2.1(c) (1988) (hereinafter KEETON & WIDISS); 12 J. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE §§ 7121 & 7151 (1981) (hereinafter APPLEMAN & APPLEMAN). The completed application may be forwarded to the insurer for assessment of the risks  after which the insurer may decide to form a *1178 contract by accepting the applicant's offer. KEETON & WIDISS, supra, at § 2.1(c).
Through an alternative transaction, the insurer may initially make the offer, and the potential insured may form a contract by accepting. Completion of an application (or some other form) and remittance of the specified premium generally constitute an acceptance. See id. (citing numerous authorities).
Andrew Jackson contends that it employs the former type of transaction; that it never accepted Willie's offer and; consequently, that formation of a contract never occurred. The evidence, however, is otherwise indicative; the agents unequivocally employed the latter type of bargaining transaction.

b. Offer, Acceptance, and Consideration
From a technical standpoint, an offer, an acceptance, and consideration are manifested in the record. See generally 12A APPLEMAN & APPLEMAN, supra, § 7196, at 54-56.
The agents expressed their assent to specific and definite terms; that is, they extended Willie an offer to form a contract and thus become enrolled in Andrew Jackson's retirement program. More specifically, the offer was conditioned on completion of an application, remittance of a premium (or signing of a payroll deduction card), and assent to essential terms delineated in the application.[8] Formation of an insurance contract requires that these essential terms "be specific, either expressly or by implication, as to the subject matter, period, rate, and amount of insurance." Mississippi Farm Bureau Mut. Ins. Co., 492 So.2d at 930; see also 12A APPLEMAN & APPLEMAN, supra, § 7196, at 56-58 ("There must generally be a complete understanding as to these matters: subject of insurance, risk, premium, duration of risk, and amount of insurance") (citing numerous authorities). In the case sub judice, all such terms were specifically expressed in writing: (1) Willie, Jerlean, and their five children were named as insureds; (2) General information pertaining to the insureds' gender, age, birth place and date, height, weight, and relevant medical history was provided; (3) The policy comprised a "Joint Duration II" worth $27,705 upon the death of either Willie or Jerlean and a "Children's Term Benefit" worth $6,000 upon the death of a child; and (4) Finally, the premium amount was calculated at $10.92  to be paid on a weekly basis through payroll deductions. Ex.Vol., at 1-2.
Acceptance of the offer (mutual assent or "meeting of the minds") was manifested through Willie's: (1) remittance of seven premiums deducted from his paycheck, and (2) completion of the application which contained the essential terms. See generally 1 A. CORBIN, CORBIN ON CONTRACTS §§ 11-108 (1963 & 1990 Supp.).
Consideration is also legally sufficient in light of both the benefit to Andrew Jackson and the detriment to Willie (i.e., detrimental reliance or promissory estoppel). Accord id. at §§ 109-209; KEETON & WIDISS, supra, at § 2.3(c)(6). On the one hand, Andrew Jackson received from Willie consideration in the form of seven premiums. Accord Pacific Mut. Life Ins. Co. v. Haslip, 553 So.2d 537, 542 (Ala. 1989) ("Courts have held that payment of a premium is necessary as a condition precedent to an enforceable contract of insurance... . By accepting these premiums, [the agent] represent[s] to the parties that their policies were both existing and current."). On the other hand, the evidence reveals that Willie relied on the agents' misrepresentations to his detriment; his reliance resulted in both tangible and intangible losses. One tangible loss was incurred when Willie allowed his then-held American Income "whole life" policy to lapse and, as a consequence, he permanently lost several years of investment or "cash value build-up" in *1179 his policy. Vol. IV, at 642-43. And as noted, Willie also lost use of seven withheld premiums, which were eventually returned devoid of interest. One intangible loss was incurred when Willie, believing he was covered under the Andrew Jackson policy, did not seek risk aversion or peace of mind from other insurance companies for himself or his family. Accord Western Nat'l Ins. Co. v. Le Clare, 163 F.2d 337, 339 (9th Cir.1947) (refraining from seeking coverage elsewhere constituted sufficient consideration for oral contract); cf. Kewin v. Massachusetts Mut. Life Ins. Co., 409 Mich. 401, 424, 295 N.W.2d 50, 57 (1980) (Williams, J., dissenting) ("[T]hat failure to provide such contracted-for peace of mind promotes emotional distress [i.e., detrimental reliance] requires no argument."). This Court is not saying that, under the facts of the case sub judice, intangible losses alone would be sufficient to find detrimental reliance; this issue is not addressed since the evidence shows that Willie incurred both tangible and intangible losses.[9]
Thus, Andrew Jackson's contention that no contract was formed (i.e., that no policy was issued) is simply contrary to the evidence adduced during discovery and trial. See also Ex.Vol., at 4 (document issued by Andrew Jackson containing the following clear and unambiguous statement: "This Entitles the Beneficiary of Policy No. 41296 to request our immediate cash benefit service for payment from the proceeds of the above numbered policy... . PAYABLE UPON THE DEATH OF Willie or Jerlean Williams.") (emphasis added); id. at 29 (A "claimant's statement," completed and filed by the agents on Willie's behalf, contains the following questions/answers: (1) "List all policy(s) numbers in this Company"/"41296," and (2) "If any policy in this Company was assigned, give particulars"/"[names of Williams-family members listed by the amount for which each is insured]"); id. at 3 (another document issued by Andrew Jackson containing number 41296 assigned to the Williams family policy).[10]

c. Summation
In sum, perusal of the recorded evidence leads this Court to conclude that "reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach [the] conclusion[]" reached by the jurors in the case sub judice. Mississippi Farm Bureau Mut. Ins. Co., 492 So.2d at 927-28 (quoting Weems v. American Sec. Ins. Co., 450 So.2d 431, 435 (Miss. 1984)). That is, a reasonable juror could have properly found that formation of a contract was sufficiently proved.

2. Whether Andrew Jackson Should Be Contractually Bound: Overview of the Law
Whether Andrew Jackson should be bound by the formed contract is dependent upon whether, as a matter of law, the evidence supports the conclusion that the *1180 agents were authorized to act on the insurer's behalf.

a. The Law of Agency
Mississippi recognizes the well-established principle that the general law of agency applies to insurers' relationships with their agents. See, e.g., Ford v. Lamar Life Ins. Co., 513 So.2d 880, 888 (Miss. 1987); Southern United Life Ins. Co. v. Caves, 481 So.2d 764, 766 (Miss. 1985). Under the law of agency, "a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority." Lamar Life Ins. Co., 513 So.2d at 888 (citing numerous authorities).
Similarly, Mississippi statute provides, in pertinent part, that "every person [who performs certain actions] for or on behalf of any ... insur[er] ... shall be held to be the agent of the company ... as to all duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract. MISS CODE ANN. § 83-17-1 (1972) (emphasis added). "The purpose of this statute is to prevent insurers from operating through third persons [e.g., agents] and later denying responsibility for the acts of those persons." Lamar Life Ins. Co., 513 So.2d at 888 (citing Mitchell v. Aetna Cas. & Surety Co., 579 F.2d 342 (5th Cir.1978)). The gist of all this is that the acts of an agent, who is deemed "authorized" as a matter of law, are imputable to the insurer. See National Life & Accident Ins. Co. v. Miller, 484 So.2d 329, 335 (Miss. 1985) ("[T]he weight of modern judicial authority throughout the country supports the proposition that `knowledge acquired by a soliciting agent in the course of his employment in soliciting insurance, preparing and transmitting applications, delivering policies, etc., is ordinarily imputed to the company.'"); Southern United Life Ins. Co., 481 So.2d at 767 (knowledge of an expressly  or apparently-authorized agent is imputed to the insurer, and "the condition of insurability [is] effectively waived and the acts [of the agent] are binding upon the [insurer]") (citing Gulf Guar. Life Ins. Co. v. Middleton, 361 So.2d 1377, 1382-84 (Miss. 1978), and Trawick v. Manhattan, 447 F.2d 1293 (5th Cir.1971)); Napp v. Liberty Nat'l Life Ins. Co., 248 Miss. 320, 159 So.2d 164 (1963) ("[I]t is well settled that the principal is liable for the frauds and misrepresentations of his agent acting within the scope of his authority or employment, even though he had no knowledge thereof and received no benefits therefrom."), quoted in Nat'l Life & Accident Ins. Co., 484 So.2d at 336; accord Pacific Mut. Life Ins. Co., 533 So.2d at 541 (Under the doctrine of respondeat superior, "`[t]he courts have ... held the principal liable for his agent's fraud committed within the actual or apparent scope of his employment, even where the fraud was committed strictly for the agent's own benefit and to the principal's detriment.'"); see also Reserve Life Ins. Co. v. McGee, 444 So.2d 803, 816 (Miss. 1983) (Robertson, J., specially concurring). These principles are based upon the doctrine of estoppel. Steen v. Andrews, 223 Miss. 694, 697-98, 78 So.2d 881, 883 (1955).

b. An Agent's Scope of Authority
An agent's authority may be actual, or it may be apparent. If an agent had apparent authority to bind his or her principal, then the issue of actual authority need not be reached. Baxter Porter & Sons Well Servicing Co., Inc. v. Venture Oil Corp., 488 So.2d 793, 796 (Miss. 1986) (citing McPherson, 221 So.2d at 75; Steen, 223 Miss. at 694, 78 So.2d at 881). "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." Lamar Life Ins. Co., 513 So.2d at 888. Restated:
[T]he principal is bound if the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have. The agent's authority as to those with whom he deals is what it reasonably appears to be so far as third persons are *1181 concerned, the apparent powers of an agent are his real powers.
Steen, 223 Miss. at 697-98, 78 So.2d at 883, quoted in Gulf Guar. Life Ins. Co., 361 So.2d at 1383, and McPherson, 221 So.2d at 78.
To recover under the theory of apparent authority, a three-prong test must be met. Specifically, recovery requires a sufficient showing of: (1) acts or conduct on the part of the principal indicating the agent's authority, (2) reasonable reliance on those acts, and (3) a detrimental change in position as a result of such reliance. See Lamar Life Ins. Co., 513 So.2d at 888; Gulf Guar. Life Ins. Co., 361 So.2d at 1383; Clow Corp. v. J.D. Mullican, Inc., 356 So.2d 579, 582 (Miss. 1978); and cases cited therein.

c. Evidence of Apparent Authority
Whether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder. Venture Oil Co., 488 So.2d at 796; Clow Corp., 356 So.2d at 593; College Life Ins. Co. of America v. Byrd, 367 So.2d 929, 930 (Miss. 1979). The jury in the case sub judice found that the test was met and that Andrew Jackson's agents were cloaked with apparent authority. This finding will not be set aside unless it is clearly contrary to the overwhelming weight of credible evidence viewed in a light most favorable to the verdict.
Evidence supportive of the jury's finding, vis-a-vis the first prong, involves the admissions during trial by an Andrew Jackson executive (Bethany) and agent (Page) as well as the blatant failure by the insurer to provide "notice of restrictions upon [the agents'] authority" to avert misleading or fraudulent representations. McPherson, 221 So.2d at 79 (Miss. 1969). For example, Page testified that he believed he was authorized to form a binding contract with any employee who held an American Income policy, completed an application, and remitted a premium via payroll deduction. See Vol. IV, at 559 ("[I] had permission of the company to tell people that ... coverage was effective right then."). Page added that, if he had to do over again, he "would do the same thing"  because to date, "nobody's ever told [me] any different." Vol. III, at 525. Page's admissions were unwittingly corroborated by Bethany during the trial, when he boasted about how "proud" Andrew Jackson was of "what [the agents] did out there [at Universal] and what [they] told people" and that "it was not necessary to do [or change] anything." Vol. IV, at 626-28 & 635-37 (further explaining that the agents' sales technique is acceptable because they are providing a public service to "a great mass of people"  i.e., they are providing a good product to those without insurance and, alternatively, they are providing a "better" product to those who are already insured by another insurer). In view of these admissions, this Court cannot conclude that the jury erroneously found that the first prong was sufficiently met.
These admissions are additionally supportive of the second prong  reasonable reliance stemming from the insurer's acts or failure to act. Indeed, if Andrew Jackson's own licensed agent, supposedly sophisticated in insurance practices, believed he was authorized  then how could this Court conclude that an unsophisticated individual like Willie should have known otherwise? In other words, Willie's reliance cannot be deemed unreasonable under the circumstances.
And why shouldn't a Universal employee believe an agent who declares that immediate risk aversion and peace of mind are attainable so long as (1) he or she currently holds an American Income policy, (2) completes an application, and (3) remits the first premium? Virtually everyday, these intangibles are offered through television commercials, newspaper circulars, mailings, and even vending machines (e.g., "trip or traveller's insurance"). These offers are made seemingly guaranteeing prospective purchasers (1) that they can immediately enroll or receive coverage "for the lowest rates possible," (2) that "no physical examination is required" and "no medical questions will be asked; and (4) that they "will not be turned down regardless of *1182 health or for any reason." But these guarantees are sometimes misleading. See KEETON & WIDISS, supra, at § 2.7. A thorough investigation generally uncovers conditions which do exist  like the proverbial "needle in a haystack"  and which essentially amount to offers to negotiate rather than offers to accept. See, e.g., Riordan v. Motor Club of N.Y., 100 Misc.2d 638, 422 N.Y.S.2d 811 (N.Y. County 1979) (insureds deemed reasonable in construing "misleading" mailing as offer to accept  not to negotiate).
The evidence adduced at depositions and at trial revealed that absolutely no oral or written notice of existent policy conditions or breadth of agents' authority was provided Willie or any Universal employee. Thus, Willie and other employees were not afforded an opportunity to become properly "informed" through inspection of sample policies, brochures, or anything, and discover that the agents' offers "wrongfully" contravened unrevealed policy conditions. As admitted by one agent: He "expected" the employees to "one hundred percent ... rely on what [he told] them about what they're getting" (or not getting). "[U]ntil the point a policy was actually put in [the employees'] hand[s], there wasn't any way for them to tell if [he] was [not informing] them [about attached conditions such as the date on which the policies became effective]." Employees "had to believe what [the agents] had to say," and "that's the way the people at Andrew Jackson [in Jackson] ... knew [the program] was set up." Vol. III, at 495-97 (testimony of Page); see also Vol. II, at 239 (Bethany admitting that he too expected the "customer [to] rely on what the agent says"); cf. Fritz v. Old Am. Ins. Co., 354 F. Supp. 514, 518 (S.D. Tex. 1973) (an insured's "reasonable expectations which [an insurer's] literature [or agent] raises or does not rebut must govern").
Bethany added that the contract which limits the authority of its agents to mere solicitation of applications is not available for public inspection. Vol. IV, at 660. What is available for inspection is a certificate of authority issued by the Mississippi Department of Insurance declaring that Page and Smith are "duly licensed to transact insurance business" and that "Andrew Jackson ... has appointed [them] to be its ... general agent[s]"  as opposed to mere "soliciting" agents. Ex.Vol., at 34 & 35 (emphasis added). This Court's holding in McPherson is especially pertinent in this regard:
A life insurance company is bound by the acts of its general agents within the scope of their real or apparent authority [and that] those dealing with such agents without notice of restrictions upon [the agents'] authority have a right to presume that [their] authority is co-extensive with [their] apparent scope and as broad as [their] title indicates.
221 So.2d 75, 79 (Miss. 1969) (emphasis added).
Finally, the third and last prong of the apparent-authority test  detrimental reliance  was also met. As discussed in Section II(A)(1)(b), supra, Willie clearly relied on the agents' misrepresentations to his detriment.

d. Summation
In sum, the evidence supports the jury's verdict; Andrew Jackson was properly found to be bound by the contract formed by its apparently authorized agents.

B. Propriety of Punitive Damages
This subsection comprises discussions re propriety of: (1) submitting the punitive-damages issue to the jury; (2) imposing liability for punitive damages; and (3) awarding $200,000 in punitive damages  an allegedly excessive amount.

1. Submission to the Jury
Whether a punitive-damages issue should be submitted to the jury is for the trial judge to decide in accordance with guidelines established by this Court. These guidelines will be examined shortly. But first, the trial judge's basis for submitting the issue will be discussed  followed by a summary of Andrew Jackson's contention (i.e., that submission was erroneous).

*1183 a. Trial Judge's Basis

Judge Bowling submitted the punitive-damages issue to the jury on the basis of his interpretation of Blue Cross & Blue Shield of Miss., Inc. v. Campbell, 466 So.2d 833 (Miss. 1984)  from which he quoted the following passages for support:
It can be argued with considerable persuasion that unless the trial judge grants a directed verdict to the insured plaintiff on the contract claim, then, as a matter of law, the insurance carrier has shown a reasonably arguable basis to deny the claim; and, therefore, the carrier should never be subjected to the possibility of punitive damages based upon "bad faith."
.....
Yet, the test is not infallible. Under some contrived or specious defense, an insurance carrier may be entitled to have the jury pass upon the issue of liability under the contract, yet not thereby insulate itself against a punitive damage claim based upon bad faith. There may be other reasons not yet encountered which may give an insurance carrier a defense on the contract itself, and yet nevertheless the carrier should be subjected to a bad faith claim.
Id. at 843 (Hawkins, J., denying petition for reh'g). Judge Bowling then cited the so-called "lying exception" to the general rule that a bad-faith issue should not be submitted to the jury if, upon presentation of all the evidence, the insured was not entitled to a directed verdict, peremptory instruction or the like, on the underlying contract or policy claim. Vol. V, at 790-95 (citing Blue Cross & Blue Shield of Miss., 466 So.2d at 852 (Robertson, J., specially concurring)).
Basically, "[t]his exception to the general rule ... would be operative only where the jury is asked to reject on grounds of deliberate falsehood or fabrication [or misrepresentation] the insurer's defense to the underlying contract claim." Blue Cross & Blue Shield of Miss., 466 So.2d at 852 (emphasis in original) (Robertson, J., specially concurring). "In such cases we must allow submission to the jury of the bad faith refusal claim even though the plaintiff insured is not entitled to a peremptory instruction [or the like] on the liability feature of his underlying claim." Id.
The judge then applied the facts of the case sub judice to the law articulated in Blue Cross & Blue Shield of Miss.:
The testimony is ample from the general agents that the  that it was their intention and their instruction to the employees and to the union and to all that they [c]ould ... change companies [and receive] automatic coverage... . I certainly don't disagree and find too much fault with Mr. Bethany for testifying that they had no such authority. But Mr. Page testified under oath that he did do so whether he was told by Mr. Bethany to do so or not.
Mr. Page was asked on two or three different occasions about lies that he told [and h]e admitted in his own words that he ... lie[d]... .
So I have no choice but to ... submit the question of punitive damages ... to the jury.
See generally Vol. V, at 793-95 (trial transcript).

b. Andrew Jackson's Contention
Andrew Jackson rejects the judge's logic and contends that the "lying exception" is not applicable to its case. Andrew Jackson's contention is based on the premise that "its defense does not require a resolution of the question of whether its agent lied." Rather, its "defense is that no contract of life insurance ever existed" and "that the conditions of the policy applied for were not fulfilled." Appellant's Brief at 31.

c. Overview of the Law
In an insurance-contract case such as the one sub judice, the trial judge is responsible for reviewing all the evidence before it in order to determine whether the issue of punitive damages should be submitted to the jury. Bankers Life & Cas. Co. v. Crenshaw, 483 So.2d 254, 269 (Miss. 1985); Blue Cross & Blue Shield of Miss., 466 So.2d at 842 (Hawkins, J., denying petition *1184 for reh'g). On appeal, this Court will review the briefs and all the recorded evidence in order to determine the propriety of the trial judge's decision regarding submission of the issue to the jury. Blue Cross & Blue Shield of Miss., 466 So.2d at 842 (Hawkins, J., denying petition for reh'g). The guideline for making such determinations has evolved over nearly two decades. See Mut. Life Ins. Co. of N.Y. v. Estate of Wesson, 517 So.2d 521, 527-28 (Miss. 1987) (providing general discussion on the "well-marked highway" of Mississippi bad-faith cases).
Pursuant to this guideline, determination of whether to submit a punitive-damages issue to the jury generally will be contingent on a determination of whether the insurer denied the underlying policy or contract claim on an arguable basis.[11] The arguable-basis theory was pronounced in the seminal bad-faith case of Standard Life Ins. Co. of Ind. v. Veal: "[I]f an insur[er] has a legitimate ... or an arguable reason for failing to pay a claim, punitive damages will [generally] not lie." 354 So.2d 239, 248 (Miss. 1977) (emphasis in original). In Blue Cross & Blue Shield of Miss., this Court elaborated:
Implicit in [Standard Life Ins. Co. of Ind.'s explanation] is the ... trial judge's ... responsibility of making the determination of whether there was an arguably reasonable basis, either legal or factual, for denying the claim. Indeed, only the trial judge could determine whether a legal basis asserted by the insur[er] for denying the claim was an "arguable reason," or "reasonably arguable."
466 So.2d at 842 (Hawkins, J., denying petition for reh'g).
Arguably-based denials are generally defined as those which were rendered upon dealing with the disputed claim fairly and in good faith. Cf. Southern United Life Ins. Co., 481 So.2d at 769 ("We have come to term an insur[er] ... which refused to pay a claim when there is no reasonably arguable basis to deny it as acting in `bad faith.'") (quoting Blue Cross & Blue Shield of Miss., 466 So.2d at 842); see also 3 APPLEMAN & APPLEMAN, supra, at § 1612 (1967 & 1989 Supp.) (insurer is under obligation to conduct "good-faith investigation ... before it finally denies liability and refuses payment" (emphasis added)). And whether the insurer rendered its denial fairly and in good faith is generally to be determined by the trial judge when he or she considers a motion for a directed verdict (or the like) on the underlying policy or contract claim. If the judge is unable to make the determination, then logic generally dictates that the insurer's rightful or wrongful denial of the claim was not reached in bad faith. In these cases, the punitive-damages issue generally should not be submitted to the jury. Pioneer Life Ins. Co. of Ill. v. Moss, 513 So.2d 927, 930 (Miss. 1987) ("[T]he issue of punitive damages should not reach the jury [when] reasonable minds could differ as to the ... legitima[cy of the policy] claim."); see, e.g., Blue Cross & Blue Shield of Miss., 466 So.2d at 839-41 (insurer's reliance on its medical staff's opinion constituted a arguable basis for denying claim); Peel v. American Fidelity Assurance Co., 680 F.2d 374 (5th Cir.1982) (insurer's reliance on a retained physician's opinion "constitute[d] an arguable defense as a matter of law" (emphasis in original)).[12]
*1185 In other cases, where the judge conclusively determines that an arguable basis for the denial or breach is not evidenced, the insurer may be deemed to have acted unfairly and in bad faith. In these cases, the punitive-damages issue generally should be submitted to the jury  notwithstanding whether a directed verdict (or the like) was granted on the insured's policy or contract claim. Reserve Life Ins. Co. v. McGee, 444 So.2d 803, 809 (Miss. 1984); see, e.g., Standard Life Ins. Co. of Ind., 354 So.2d at 248 (Submission of punitive-damages issue may be warranted in a case involving "refusal to honor the claim [for] a reason clearly contrary to the express provisions of its own policy"); see also Richards v. Allstate Ins. Co., 693 F.2d 502 (5th Cir.1982) (Submission warranted for "failure to provide adequate procedures to prevent erroneous denials [of] claim[s].").
And "in rare cases the defendant's denial of the plaintiff's allegations of bad faith leads to a sharp conflict in evidence necessitating jury resolution so that [determination of whether the insurer's denial or breach was unfair and in bad faith] is out of the question." State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242, 254 (Miss. 1985), quoted in Aetna Cas. & Surety Co. v. Day, 487 So.2d 830, 834 (Miss. 1986). In Reserve Life Ins. Co., this Court similarly opined:
In the event the trial [judge] determines that as a matter of law it cannot hold that the insurer had a legitimate and arguable defensive position, but that the evidence constituted disputed facts as to whether or not such situation existed, then the trial [judge] should submit th[e arguable-basis and punitive-damages] issue[s] to the jury.
444 So.2d at 809. In these cases, the judge may upon post-verdict motion and upon reflection find: (1) that the insurer did deny on an arguable basis; (2) that the punitive-damages issue should not have been submitted to the jury; and (3) that an award of punitive damages under the facts and circumstances are (or were) inappropriate as a matter of law. Cf. id. at 818 (Robertson, J., specially concurring) (citing MISS.R. CIV.P. 49(b)).
Some of the foregoing principles are not ironclad; that is, absence or presence of an arguable basis is not per se determinative of whether the punitive-damages issue should be submitted to the jury. See Aetna Cas. & Surety Co., 487 So.2d at 834 ("This Court ... here notes that ... exceptions do exist."); Blue Cross & Blue Shield of Miss., 466 So.2d at 843 (Hawkins, J., denying petition for reh'g) ("[T]he test is not infallible.").
Submission of the punitive-damages issue may not be warranted  notwithstanding an absence of an arguable basis for the denial or breach. See Pioneer Life Ins. Co. of Ill., 513 So.2d 927, 930 (Miss. 1987) ("The fact that an insurance company lacks a legitimate or arguable reason for denying a claim does not automatically lead to the conclusion that the issue of punitive damages should be submitted to the jury.") (emphasis in original) (citing State Farm Fire & Cas. Co., 477 So.2d at 250). For example, the punitive-damages issue should not be submitted to the jury in cases involving an insurer who wrongfully denied a claim because of "clerical error or honest mistake"  though "objectively speaking, [error or mistake does not constitute an] arguable reason for failure to honor a just *1186 claim." See Weems v. American Sec. Ins. Co., 486 So.2d 1222, 1227 (Miss. 1986); but see Blue Cross & Blue Shield of Miss., Inc. v. Maas, 516 So.2d 495, 497-98 (Miss. 1987) (punitive damages properly awarded where denial was result of clerical error because insurer eventually discovered error but failed to pay claim after undue delay).[13]
Conversely, Mississippi law has evolved to a point of recognition that submission of the punitive-damages issue may be submitted  notwithstanding the presence of an arguable basis. Aetna Cas. & Surety Co., 487 So.2d at 834 ("[U]nder some contrived or specious defense, an insur[er] may be entitled to have the jury pass upon the issue of liability under the contract, yet not thereby insulate itself against [submission of] a punitive damage claim based upon bad faith."); Blue Cross & Blue Shield of Miss., 466 So.2d at 833 (Hawkins, J., denying petition for reh'g) ("There may be ... reasons not yet encountered which will give an insurance carrier a defense on the contract itself, and yet nevertheless the carrier should be subject to [submission of] a bad faith claim.") This Court will not attempt to hypothesize "all such extreme factual situations" which could constitute exceptions. Aetna Cas. & Surety Co., 487 So.2d at 834. Some examples may be conceived through inference from, and analogy of, factual circumstances attendant cases which were previously before this Court.
For example, an insurer who denies a claim on an arguable basis could conceivably be held liable for punitive damages if the insured's financial straits were used as a settlement leverage. Cf. Travelers Indem. Co. v. Wetherbee, 368 So.2d 829 (Miss. 1979) (inferring that punitive damages may be appropriate when insurer unduly delays payment of claim and uses insureds' "financial dire straits" as settlement leverage). In another example, an insurer who denies a claim on an arguable basis could conceivably be held liable for punitive damages for infliction of emotional distress through commission of sufficiently-repugnant acts in dealing with the insured and disputed claim. Cf. Maas, 516 So.2d at 498 (punitive damages could be awarded in cases involving infliction of emotional distress) (Robertson, J., concurring); Blue Cross & Blue Shield of Miss., 466 So.2d at 845 (same) (Hawkins, J., denying petition for reh'g) (citing numerous authorities). Accordingly, RESTATEMENT (SECOND) OF CONTRACTS § 353 (1979) posits that damages for infliction of emotional distress should be recoverable in cases involving breach of an insurance contract because emotional distress seems to be a "particularly likely result" of such breaches. See also Note, Damage Measurements for Bad Faith Breach of Contract: An Economic Analysis, 39 STAN. L.REV. 161, 165 n. 18 (1986); Crisci v. Security Ins. Co., 66 Cal.2d 425, 429, 426 P.2d 173, 176, 58 Cal. Rptr. 13, 16 (1967) (clear case of infliction of emotional distress resulting from insurer's bad-faith breach); but see Tartaglio, The Expectation of Peace of Mind: A Basis for Recovery of Damages for Mental Suffering Resulting From the Breach of First Party Insurance Contracts, 56 S.CAL.L.REV. 1345, 1347 (1983) (author concludes that state courts have not been amenable to the notion that punitive damages should be awarded for infliction of emotional distress).

d. The Law and the Case Sub Judice
Applying the law to the evidence, this Court cannot conclude that the punitive-damages issue was erroneously submitted to the jury. This Court is not persuaded by Andrew Jackson's contention that, under the facts of the case sub judice, the so-called "lying exception" is inapplicable. To reiterate, the "lying exception" is "operative ... where the jury is asked to reject on *1187 grounds of deliberate falsehood or fabrication [or misrepresentation] the insurer's defense to the underlying contract claim." This is precisely what happened in this case.
Andrew Jackson based its denial of Willie's claim on Jerlean's allegedly undisclosed heart condition and an absence of a binding contract. Willie contended, however, that these bases should be rejected because the agents: (1) misrepresented Jerlean's disclosed heart condition to Andrew Jackson, and (2) misrepresented policy provisions to Willie and other Universal employees. Andrew Jackson knew (through Willie's pre-complaint information) or constructively knew (through imputation) or should have known (through diligent and thorough investigation) about its agents' misrepresentations. Such misrepresentations created a jury issue of whether Andrew Jackson's denial was arguable. See also Pioneer Life Ins. Co. of Ill., 513 So.2d at 931-32 (Failure to thoroughly investigate and "cavalier treatment" of the insured "cannot be said to be good faith dealing and certainly cannot give rise to a legitimate or arguable reason.") (Sullivan, J., specially concurring).
Assuming, arguendo, that Andrew Jackson denied Willie's claim on an arguable basis  this case could be deemed an exception to the general rule that the punitive-damages issue should not be submitted to the jury under such circumstances. To reiterate, "under some contrived or specious defense, an insur[er] may be entitled to have the jury pass upon the issue of liability under the contract, yet not thereby insulate itself against [submission of] a punitive damage claim based upon bad faith." Aetna Cas. & Surety Co., 487 So.2d at 834; see Blue Cross & Blue Shield of Miss., 466 So.2d at 833 (Hawkins, J., denying petition for reh'g). Sufficient evidence existed for a judge to conclude that  notwithstanding the possibility or probability that the claim was denied on an arguable basis  Andrew Jackson and its agents' egregious mishandling of Willie's case and consequential breach of the implied covenant of good faith and fair dealing may have reached a heightened level of an independent tort. In such questionable cases: (1) the issue should be submitted to the jury for resolution; and (2) if the jury resolves the issue against the insurer; (3) the trial judge may upon post-verdict motion and upon reflection find: (a) that the evidence is not supportive of the verdict; (b) that issue should not have been submitted to the jury; and (c) that j.n.o.v. or a new trial should be granted. Cf. Aetna Cas. & Surety Co., 487 So.2d at 834; State Farm Fire & Cas. Co., 477 So.2d at 254; Reserve Life Ins. Co., 444 So.2d at 809; MISS.R.CIV.P. 49(b).

2. Imposition of Liability

a. Overview of the Law
A fact-finder's assessment of punitive damages "is no different in `bad faith' cases than in other ... cases involving a request for punitive damages." State Farm Fire & Cas. Co., 477 So.2d at 250, quoted in Maas, 516 So.2d at 497, and Transport Indem. Co. v. Scott, 513 So.2d 889, 896 (Miss. 1987). Accordingly, this Court has held that an act of bad faith alone cannot be deemed sufficiently tortious to warrant imposition of punitive-damages liability. Maas, 516 So.2d at 496. In one oft-quoted case, this Court opined that, as a matter of law, "ordinary torts, the product of forgetfulness, oversight, or the like," do not "rise to the heightened level of an independent tort" which warrant imposition of punitive-damages liability. State Farm Fire & Cas. Co., 477 So.2d at 250, quoted in Pioneer Life Ins. Co. of Ill., 513 So.2d at 930 (case in which this Court reversed punitive-damages award because insurer's "failure to pay the claim ... was a mere clerical error and an honest mistake"); Mississippi Farm Bureau Mut. Ins. Co., 492 So.2d at 932-33; Aetna Cas. & Surety Co., 487 So.2d at 832-33; see American Sec. Ins. Co., 486 So.2d at 1227 ("[C]lerical error or honest mistake" constitutes a defense to imposition of punitive damages "though objectively speaking the insurer has no arguable reason for failure to honor a just claim."); Southern United Life Ins. Co., 481 So.2d at 769 (Notwithstanding absence of an arguable basis, punitive damages may be unjustified in a case *1188 involving an "honest mistake or oversight  ordinary or simple negligence  not reaching the heightened status of an `independent tort.'"); Consolidated Am. Life Ins. Co. v. Toche, 410 So.2d 1303, 1304 (Miss. 1982) ("[P]unitive damages will not lie ... in cases of simple negligence involving miscalculation of premiums or benefits"); see also Maas, 516 So.2d at 497 (case in which jury did not believe insurer's claim that its "admitted erro[neous failure to pay a claim] was merely the result of an oversight"); Employers Mut. Cas. Co. v. Tompkins, 490 So.2d 897, 903 (Miss. 1986) (case in which this Court rejected insurer's claim that it made an honest mistake in its construction of policy provisions).
Restated, the law requires a finding of "bad faith-plus"  based upon a preponderance of the evidence  before punitive damages may be awarded. Accord Mutual Life Ins. Co. of N.Y., 517 So.2d at 528; Aetna Cas. & Surety Co., 487 So.2d at 832; Mississippi Farm Bureau Mut. Ins. Co., 492 So.2d at 926. Generally speaking, this simply means that punitive damages may not be awarded "in the absence of finding an independent tort separate from the breach of contract." Aetna Cas. & Surety Co., 487 So.2d at 835 (citing State Farm Fire & Cas. Co., 477 So.2d at 242).
Through the years, explanations of what may constitute requisite "tortious" conduct have varied  albeit minimally. See, e.g., Mutual Life Ins. Co. of N.Y., 517 So.2d at 528 ("The test requires [a showing of] some willful or malicious wrong" or "gross negligence or reckless disregard for the rights of others.") (quoting American Sec. Ins. Co., 486 So.2d at 1226-27, and Aetna Cas. & Surety Co., 487 So.2d at 832); Maas, 516 So.2d at 496-96 (requisite conduct may involve an "intentional wrong, insult, or abuse" or it may involve "gross negligence"); Bankers Life & Cas. Co., 483 So.2d at 269 (may involve "willful and intentional wrong, or ... such gross negligence and reckless negligence as is equivalent to such a wrong") (citing Seals v. St. Regis Paper Co., 236 So.2d 388 (Miss. 1970)); State Farm Fire & Cas. Co., 477 So.2d at 250 ("heightened torts, which are the product of gross, callous or wanton conduct, or, if intentional, are accompanied by fraud or deceit") (citing Lincoln Nat'l Life Ins. Co. v. Crews, 341 So.2d 1321, 1322 (Miss. 1977)); Standard Life Ins. Co. of Ind., 354 So.2d at 247 (involves "some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule") (quoting Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 150-51, 141 So.2d 226, 233 (1962) (Fowler also noted that "punitive damages are applicable [to acts of] fraud." (emphasis added)); Progressive Cas. Ins. Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975) ("intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort"); American Ry. Express Co. v. Bailey, 142 Miss. 622, 631, 107 So. 761, 763 (1926) (seminal case holding requisite conduct should involve "some intentional wrong, insult, abuse, or gross negligence, which amounts to an independent tort"); see also D. DOBBS, LAW OF REMEDIES § 3.9, at 205 (1976) ("almost any term that describes misconduct coupled with a bad state of mind will describe the case for a punitive award").
The theory supporting imposition of punitive-damages liability for commission of rarely-proven tortious conduct inheres the maxim "that every contract contains a[n implied] covenant of good faith and fair dealing." Note, Damage Measurements for Bad Faith Breach of Contract: An Economic Analysis, 39 STAN.L.REV. 161, 161 (1986) (citing numerous supportive authorities). This covenant applies to both insured and insurer  albeit more so to the latter party. In short, the duty requires abstinence by all parties from commission of wrongful conduct which injures "the right of [the another] to receive the benefits of the agreement." Shipstead & Thomas, Comparative and Reverse Bad Faith: Insured's Breach of Implied Covenant of Good Faith and Fair Dealing as Affirmative Defense or Counterclaim, XXIII TORT & INS.L.J. 215, 218 (1987).
Recognition of an implied covenant and an evolving significant expansion of insurer liability stem from the recognition of *1189 "the `special relationship' existent between the insurer and insured, as well as the superior bargaining position of the insurer." Kornblum, The Current State of Bad Faith in the U.S., XXIII TORT & INS.L.J. 812, 813 (1988). In probably the seminal case inhering this recognition, the California Supreme Court opined:
It is a matter almost of common knowledge that a very small percentage of policy holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous ... and in their numerous conditions and stipulations furnishing what may be veritable traps for the unwary... . [C]ourts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent.

Raulet v. Northwestern Nat'l Ins. Co. of Milwaukee, 157 Cal. 213, 230, 107 P. 292, 298 (1910) (emphasis added); see also W. SHERNOFF, S. GAGE & H. LEVINE, INSURANCE BAD FAITH LITIGATION § 1.03, at 1-7 (1989) (Unequal bargaining power results from "inability of most insureds to understand the technical nature of an insurance contract, the various conditions and governmental regulations afforded such contracts, the economic necessity of mass production and sales of insurance contracts, and the characteristic disparity in the financial backing between the parties.") (citing E. PATTERSON, ESSENTIALS OF INSURANCE LAW § 1, at 2-3 (2d ed. 1957)); see generally Kessler, Contracts of Adhesion  Some Thoughts about Freedom of Contract, 43 COLUM.L.REV. 629 (1943); Patterson, The Delivery of a Life Insurance Policy, 33 HARV.L.REV. 198 (1919). In another case, the Texas Supreme Court opined:
[W]e have recognized that a duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract.
In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers could arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over evaluation, processing and denial of claims. For these reasons, a duty is imposed that "[an] indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business."
Arnold v. National County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987) (citations omitted). And finally, the Arizona Supreme Court explained that:
[O]ne of the benefits that flow [sic] from the insurance contract is the insured's expectation that his insurance company will not wrongfully deprive him of the very security for which he bargained or exposed him to the catastrophe from which he sought protection. Conduct by the insurer which does destroy the security or impair the protection purchased breaches the ... covenant of good faith and fair dealing implied in the contract.
Rawlings v. Apodaca, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986).
The possibility of being held liable for punitive damages acts primarily to punish and deter. See Maas, 516 So.2d at 497; Reserve Life Ins. Co., 444 So.2d at 808 ("If an insur[er] ... could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity") (quoting Standard Life Ins. Co. of Ind., 354 So.2d at 247); accord Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972) ("[Punitive damages serve as] punishment for the wrongdoing ... and as an example so that others may be deterred from the commission of similar offenses thereby in theory *1190 protecting the public."), quoted in Standard Life Ins. Co. of Ind., 354 So.2d at 247; Bankers Life & Cas. Co., 483 So.2d at 268-69 (punitive damages also acts "to award a plaintiff for public service in bringing the wrongdoer to account") (citing Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 151, 141 So.2d 226, 233 (1962); SHERNOFF, GAGE & LEVINE, supra, at § 8.02 (Punitive damages are imposed for another purpose as well: "[P]roviding ... an incentive to litigate injustices that might otherwise go unredressed"  "undoubtedly ... important in a contemporary society ... dominated by corporations wielding vast amounts of wealth."). However, punitive damages must be assessed "within narrow limits" and with great "caution." Maas, 516 So.2d at 497; see Consolidated Am. Life Ins. Co., 410 So.2d at 1304-05; Standard Life Ins. Co. of Ind., 354 So.2d at 247.

b. The Law and the Case Sub Judice
Applying the law to the case sub judice, this Court cannot conclude that imposition of liability was improper. The jury's finding is clearly supported by a preponderance of the evidence. The record is replete with evidence evincing "bad faith-plus."
For example, the record evinces: (1) egregious breach by both Andrew Jackson and its agents of the implied covenant of good faith and fair dealing; (2) attempted use of Willie's financial dire straits, lack of sophistication, and inferior bargaining position as a settlement leverage; (3) acts of fraud; and (4) general cavalier treatment of Willie.
In view of all the evidence, this Court holds that a reasonable jury could have found that the conduct of Andrew Jackson and its agents reached the heightened level of an independent tort  which cannot be ignored nor go unredressed. The jury's awarding of punitive damages stands.

3. Amount of the Award
As noted, the jury awarded Willie $200,000 in punitive damages  which Andrew Jackson contends is excessive because it "violates the rule that punitive damages are granted in the nature of punishment, but not to destroy the defendant's financial status." Appellant's Brief at 40.

a. Overview of the Law
Under current Mississippi law, the "quantum" of a punitive-damages award is measured upon consideration of certain general factors. First, the amount awarded should serve to punish the insurer and to deter it from committing similar offenses in the future. Second, the amount should serve as an example set to deter others from committing similar offenses. Third, the amount awarded should account for the insurer's pecuniary ability and financial worth. And fourth, the amount constitutes compensation for the plaintiff for his or her "public service" in bringing the action. See, e.g., Mutual Life Ins. Co. of N.Y., 517 So.2d at 532 (citing numerous authorities).
Measurement of the amount is a matter solely committed to the jury's fettered discretion. Id. at 540 (Punitive-damages "awards are most properly submitted to the `discretion, sound judgment and combined wisdom of jurors drawn indiscriminately from every walk of life.'") (Anderson, J., dissenting); see also Bankers Life & Cas. Co., 483 So.2d at 278. Generally, the jury's determination will remain undisturbed. However, an award may be vacated or reduced in some cases for exceptional reasons. See, e.g., Mutual Life Ins. Co. of N.Y., 517 So.2d at 532 (verdict may be disturbed for "exceptional causes" or in the event the "amount is arbitrary or unreasonable") (citing numerous authorities); Bankers Life & Cas. Co., 483 So.2d at 278 (verdict may be disturbed if it is "against the overwhelming weight of the evidence" or it "evinces passion, bias and prejudice on the part of the jury so as to shock the [`judicial'] conscience") (citing numerous authorities); see also MISS. CODE ANN. § 11-1-55 (1972 & 1989 Supp.) (providing the judiciary with authority to grant motion for additur, remittitur, or new trial when amount of damages is excessive or contrary to the overwhelming weight of evidence, or was "influenced" by *1191 bias, prejudice, or passion); see, e.g., First Am. Nat'l Bank of Iuka v. Mitchell, 359 So.2d 1376, 1381 (Miss. 1978) (award deemed arbitrary because defendant's net worth and financial condition were not shown); Mutual Life Ins. Co. of N.Y., 517 So.2d at 533 ("after applying the established standards," jury award of $8,000,000 was reduced to $1,500,000). Of utmost significance, a jury verdict will not be disturbed simply because it seems "too high" or "too low." Bankers Life & Cas. Co., 483 So.2d at 278 (citing Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036, 1037 (Miss. 1979).
On appeal, this Court is essentially asked to review the trial judge's decision in response to a motion for a remittitur, additur, new trial, or the like. Bankers Life & Cas. Co., 483 So.2d at 279; see Standard Life Ins. Co. of Ind., 354 So.2d at 249; MISS. CODE ANN. § 11-1-55 (1972 & 1989 Supp.). Therefore, this Court must apply the applicable standards (discussed in the preceding paragraphs) and determine if the trial judge in the case sub judice abused his discretion. Accord Jesco, Inc. v. Shannon, 451 So.2d 694, 714-16 (Miss. 1984); Dorris v. Carr, 330 So.2d 872, 874 (Miss. 1976).

b. The Law and the Case Sub Judice
Andrew Jackson's contention that the award is grossly excessive because it "destroy[s its] financial status" is merely conclusory and virtually devoid of substantiation. That is, Andrew Jackson reached its conclusion without specific application of the standard discussed in the preceding subsection  albeit the various factors which compose the standard are mentioned in its brief. For example, Andrew Jackson correctly notes that measurement of a punitive-damages award requires consideration of: "(1) an amount necessary to punish ... and ... deter; (2) an amount ... necessary to make an example of the defendant ...; and (3) the financial worth of the defendant." Id. See Appellant's Brief at 40. But Andrew Jackson does not explain how the amount awarded constitutes a breach of these requisite considerations. Andrew Jackson's sole premise for its "grossly-excessive" conclusion is a comparison of percentages:
The present award of 5 1/4% of the net worth of defendant is not justified. In [Mutual Life Ins. Co. v. Wesson, this] Court noted that the "net assets" of the defendant there were $8 billion. Thus, the punitive damages award of $8 million was equivalent to one-tenth of one percent of the net worth of the defendant. The amount of punitive damages allowed after the remittitur in Wesson was equivalent to less than two hundredths of one percent of the net worth of the defendant. These numbers illustrate the absurdity of the punitive damages award against Andrew Jackson in this case. Under the rule in Wesson, the punitive damages award against Andrew Jackson is excessive as a matter of law.
Id. at 41. Thus, Andrew Jackson seems to believe that this Court has pronounced a "hard and fast" rule of percentages to be applied in cases involving punitive damages. This is clearly not the case. As most aptly stated by Justice Sullivan in Bankers Life & Cas. Co.: "[N]o hard and fast rule may be laid down with regard to the maximum amount of punitive damages which may be awarded in a given case." 483 So.2d at 279. Indeed, no "yardstick" could possibly be created to measure such awards since totality of circumstances attendant a case varies on an ad hoc basis. Justice Patterson opined for a majority of this Court: "Although inexact, ... the better formula for review is to give due consideration to the degree and nature of transgression from reasonable and lawful practices and the likely harmful effect upon the individual litigant and the public." Employers Mut. Cas. Co. v. Tompkins, 490 So.2d 897, 907 (Miss. 1986).
Upon perusing Andrew Jackson's contention and applying the standard to the facts of the case sub judice, this Court concludes that the award is not grossly excessive and that the trial judge committed no discretionary abuse.

C. Propriety of the Jury Instructions
Finally, Andrew Jackson presented issues pertaining to the substantive propriety *1192 of the jury instructions. The record and briefs have been perused. This Court concludes that no reversible error was made by the trial judge.

III. CONCLUSION
Before concluding this opinion, an afterword is in order. This case involved a seemingly pervasive and problematic insurance practice described and poignantly criticized by Justices Hawkins and Sullivan in a specially concurring opinion:
[The] sole source of [agents'] income from [the insurer] was on commission... .
If the policy was issued following [completion of] the application, they kept the commission. If the policy was not issued, the premium had to be refunded.
When the soliciting agent, rather than the applicant fills in the application, it is naive to assume that there is not a strong temptation on his part to ignore an answer the applicant gives which would prevent the company's issuing a policy, which would "knock out" a sale.
The insurance companies surely know this. Yet, they permit their agents to be put in such conflict of interest positions, only to assert later, with a presumably straight face, that precisely what happened in this case should never occur.
... [H]aving approved a system or practice which encourages giving false answers (by their own agents) to questions on their application forms, they use the deceit of their own employees as a weapon to deny a claim.
... The question then follows, why don't insurance companies [remedy the situation]?
National Life & Accident Ins. Co., 484 So.2d at 339.
In the case sub judice, Page testified that "out of each one of these policies down there at Universal, [he] get[s] fifty percent of the premium." "If you don't produce you don't get paid." Vol. III, at 525. Thus, an incentive existed for overzealous agents to misrepresent the facts. See Lamar Life Ins. Co., 513 So.2d at 889. Andrew Jackson could have nullified the incentive and reduced the risk of any resultant legal quagmire and adverse economic effect by implementing protective measures. Cf. Green v. State Farm Fire & Cas. Co., 667 F.2d 22, 25 (9th Cir.1982). These measures could have entailed providing Willie with explicit information regarding scope of the agents' authority as well as when and under what conditions coverage would become effective. For example, Andrew Jackson could have issued a "conditional receipt" (or the like) containing such information. Accord Lamar Life Ins. Co., 513 So.2d at 881 (conditional receipt issued by insurer contained such information and, implementation of that and other protective measures was responsible in part for holding that actual or apparent authority was non-existent); Smith v. Westland Life Ins. Co., 15 Cal.3d 111, 123 Cal. Rptr. 649, 657, 539 P.2d 433, 441 (1975) ("to avoid... obligation of providing [virtually unconditional coverage, the insurer] must not only use clear and unequivocal language evidencing its intent to limit coverage pending its approval of the policy, but [it] must also call such limiting conditions to the attention of the applicant"); KEETON & WIDISS, supra, at § 2.3(d) ("insurers [should] adopt procedures that ensure that each applicant is ... clearly informed of exact[] ... conditions [of] ... coverage").
In addition, Andrew Jackson could have provided such information in the application  a practice common in the insurance industry.
Some insurers have designed simple, easily understood application[s] ... with prominently displayed explanations of both the limitations as to when coverage will commence... . [I]nsurers employing this approach have adopted specific measures designed to assure either that the applicant has the same . .. expectations.
Id. § 2.3(d); see id. § 2.1(c) ("[A]pplication[s] used by many insurers provide that the insurer's acceptance ... of an applicant's offer will not occur until the ... policy is [issued or] literally delivered to *1193 the applicant."); Lamar Life Ins. Co., 513 So.2d at 881 & 888-89.
Insurers are admonished to exercise "more careful selection and supervision of their agents." State Farm Fire & Cas. Co., 667 F.2d at 25; see Vol. II, at 225 & 241-42 (Andrew Jackson admits training and supervision of its agents "not near as good as it should be"); Vol. II, at 317 (agent admits Andrew Jackson provides no guidance regarding "presentation" of its product).
Regrettably for Andrew Jackson, no compunctious feelings about the inexcusable mishandling of Willie's case can be gleaned from the record or briefs. The insurer can continue to "play the odds" through usage of risky practices which motivates agents to make misrepresentations; they can then deny a claim; flippantly "absolve" itself of any responsibility for such misrepresentations; and it can lose. In this case, the insurer "played the odds and lost." National Life & Accident Ins. Co., 484 So.2d at 339 (Hawkins and Sullivan, JJ., specially concurring). Accordingly, this Court affirms the jury verdict in its entirety.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
BLASS, J., concurs by separate written opinion, joined by ROY NOBLE LEE, C.J., and PITTMAN, J.
BLASS, Justice, concurring:
I concur in the result reached by the majority. While my respect for the writer of the majority opinion is great and unfeigned, and while I hold the learned Justice in high esteem, I protest that the opinion is too long and will be seriously burdensome to the Bar. It would be an excellent journal article, but it is difficult to tell how much of it is law. In my opinion, the case is properly decided and could have been readily and adequately treated in five to six pages. It is an important case but its precedential usefulness is diminished by the length and complexity of the discussion. It is difficult to separate the academic discussion and incidental comment, obiter dicta, from those parts of the opinion which set out the facts and the law which led the Court to the conclusion which it reached.
My impression is that the Court is saying in this case that the defendant clothed its agents with apparent authority to solicit insurance business and to close contracts with prospective insureds on the spot; that the agents, designated in posted writings from the defendant as "general" agents, promised people instant coverage, induced them to sign payroll deductions; induced them to drop insurance which they then had in effect by representing that they were instantly covered by new policies upon signing a payroll deduction slip; that the plaintiff was so induced by the agent to drop his current insurance and to sign with the defendant; did so to his detriment; lost his insurance which was then in effect only to have defendant deny him coverage, claiming that his wife was uninsurable, and that the application forms, filled out by its "general agent", did not make full disclosures. After the wife died (before the policy was issued) the evidence showed that the company attempted to induce the plaintiff to sign a settlement, amounting to a release of his benefits under the policy without advising him what it was, by offering him "his check" for a thousand dollars but nothing more. The sales pitch had promised that a thousand dollars would be immediately available in the event of a death claim, with the remainder to be paid in course.
The company, in effect, set up its agents to contract with individuals such as the plaintiff, irresponsibly inducing them to give up the insurance then in effect, allowing the agents to hold themselves out as general agents, and then walked away leaving the grossly mistreated "insured" with no protection of any kind. The jury found that the defendant was bound by the acts of its agents and that the gross misconduct of the defendant justified punitive *1194 damages. We agree on all points. There is no new law in this decision.
Respectfully.
ROY NOBLE LEE, C.J., and PITTMAN, J., join this opinion.
NOTES
[1] National Life & Accident Ins. Co. v. Miller, 484 So.2d 329, 339 (Miss. 1985) (Hawkins and Sullivan, JJ., specially concurring).
[2] Whether an allegedly excessive punitive-damages award is violative of rights embodied in the United States Constitution  is an issue presently before the United States Supreme Court on certiorari. See Pacific Mutual Life Ins. Co. v. Haslip, 553 So.2d 537, 543 (Ala. 1989) (million-dollar, punitive-damages award not unconstitutionally excessive.).
[3] The so-called $1,000 "check" is not actually a check which can be taken to a bank and cashed. The only purpose it seems to serve is as a misleading gimmick to promote sales of Andrew Jackson's policies. Vol. IV, at 628-29; Ex. Vol., at 4.
[4] "Risk aversion" may be understood through the following illustration.

An individual has a choice: (1) of receiving $5.00, or (2) of receiving a 5% chance of winning $100.00. Both choices are the same to the extent that $5.00 "is the expected benefit" of a 5% chance of winning $100.00. Some individuals may, some of the time, be indifferent when faced with the option of choosing to receive a "certain amount" (i.e., $5.00) or its "uncertain or expected equivalent" (i.e., 5% chance of winning $100.00); these individuals are so-called "risk neutral." Many individuals are "risk adverse"; they would choose the certain amount. And those who are "risk preferring" would choose the uncertain or expected equivalent. Law-and-economic theorists generally contend that, by definition, insurers are risk neutral (though their risks are "infinitesimal"); insureds are risk adverse; and gamblers are risk preferring. R. POSNER, TORT LAW: CASES AND ECONOMIC ANALYSIS 3 (1982); see R. POSNER, ECONOMIC ANALYSIS OF LAW 91-96 (providing further illustrations and explanations"); see also Note, Damage Measurements for Bad Faith Breach of Contract: and Economic Analysis," 39 STAN.L. REV. 170-71 (1986).
[5] The "peace of mind" concept was poignantly described by Justice Lent of the Oregon Supreme Court:

That insurers sell their product as being not only an agreement to indemnify the insured for certain kinds of loss but also to relieve the purchaser from anxiety concerning all aspects of claims is readily apparent in our society. One cannot watch televised entertainment for very long without being exposed to commercials for the sale of insurance which, for example, indicate that the purchaser will be in "good hands," that he will have the assistance of a troop of mounted cavalry, that he [will have] "a piece of the rock," or that "like a good neighbor" the insurer will be there. As such advertisements reflect, the relationship between insurer and insured does not merely concern indemnity for monetary loss [risk aversion].
Farris v. United States Fidelity & Guar. Co., 284 Or. 453, 479 n. 4, 587 P.2d 1015, 1028 n. 4 (1978) (Lent, J., dissenting); cf. Kewin v. Massachusetts Mutual Life Ins. Co., 409 Mich. 401, 424, 295 N.W.2d 50, 57 (1980) (Williams, J., dissenting) ("[I]t is common knowledge that ... insurance is obtained to promote peace of mind.").
[6] "Universal's computerized payroll system had only one position or `slot' for the deduction of life insurance premiums." Appellant's Main Brief at 4 n. 2. If an employee decided to purchase Andrew Jackson's product (i.e., the "retirement plan with death benefits"), they would have to sign the deduction card. This would result in: (1) cessation of premium payments to, for example, American Income and (2) commencement of payments to Andrew Jackson. Employees were concerned that coverage under their current policies (e.g., under their American Income policies) would consequently lapse, and they would be without insurance  unless Andrew Jackson's plan was effectuated immediately upon signing the deduction card. Vol. IV, at 607-08.
[7] "Clock alley" is an area inside Universal through which employees pass daily on their way to and from work and lunch. Vol. III, at 494.
[8] Another condition seems to be reflected in the record. The agents seem to have extended their offer of immediate coverage to those, who at the time, held American Income policies. Whatever the case may be, the agents knew Willie held an American Income policy when they extended an offer to him. And a notation was made on the application indicating that the coverage being purchased would replace coverage under an American Income policy. Ex. Vol., at 1-2.
[9] Were Mississippi an adherent to the "traditional" view with regard to measurement of damages for breach of contract  intangible losses would be an irrelevant factor in the detrimental-reliance analysis. That is, Mississippi recognizes that an insured bargains for more than mere eventual monetary proceeds of a policy; insureds bargain for such intangibles as risk aversion, peace of mind, and certain and prompt payment of the policy proceeds upon submission of a valid claim.

More specifically, under the restrictive "traditional" approach to determining damages for breach of contract, no extra-contractual recovery is permitted (i.e., an insurer may be held liable only for the amount of the policy, plus interest.). See D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 12.1, at 788-90 (1976) (discussing "expectation" damages); R. POSNER, ECONOMIC ANALYSIS OF LAW 105-17, 124 & 491 (1986) (general discussion on damages for breach of contract); see, e.g., Casson v. Nationwide Ins. Co., 455 A.2d 361, 368 (Del. Super. Ct. 1982) ("[T]raditionally, recovery for breach of an insurance contract is confined to the actual amount owed under the contract plus legal interest."); Lawton v. Great S.W. Fire Ins. Co., 118 N.H. 607, 392 A.2d 576 (1978) (same); A.A.A. Pool Serv. & Supply Inc. v. Aetna Casualty & Surety Co., 121 R.I. 96, 395 A.2d 724 (1978) (same).
[10] Neither Willie nor Andrew Jackson differentiated between interim and long-term contracts. See KEETON & WIDISS, supra, at §§ 2.1 & 2.3(a). Because the evidence in the case sub judice supports the conclusion that a long-term contract was formed, this Court need not decide whether an interim contract was formed.
[11] Various phrases have been used by this Court to describe the basis upon which an insurer may deny a claim and avoid, in most cases, punitive-damages liability. Compare Reserve Life Ins. Co. v. McGee, 444 So.2d 803, 809 (Miss. 1983) (using "reasonably arguable basis"), with Mutual Life Ins. Co. of N.Y., 517 So.2d at 528 ("arguable reason or a legitimate reason or a justifiable reason[  ]all three [phrases mean] the same"), and Reserve Life Ins. Co., 444 So.2d at 815 (Robertson, J., specially concurring) ("`[L]egitimate' and `arguable' and `reasonable' are surely synonyms. There is I insist no such thing as a `legitimate reason' which is not by definition a `reasonable reason.' The same of `arguable reason.' Clarity demands that we jettison two of these synonyms. I would salvage `arguable.'").

In this opinion, the basis must be "arguable"  since the term inheres "reasonableness." See, e.g., BLACK'S LAW DICTIONARY 98-99 (5th ed. 1979); THE AMERICAN HERITAGE DICTIONARY 126-27 (2d ed. 1985).
[12] Accord Northwestern Nat'l Ins. Co. v. Pope, 791 F.2d 649, 652 (8th Cir.1986) (to avoid punitive-damages liability in bad-faith cases, insurer must have denied "validity of insured's claim" on "fairly debatable" basis  e.g., where insurer's "regrettable" delay in settling part of claim was not wholly unjustified, and where insurer's failure to pay another part of claim was due its belief that payment would result in double recovery by insured in violation of policy provision) (applying Iowa law); Federated Guar. Life Ins. Co. v. Wilkins, 435 So.2d 10, 12-13 (Ala. 1983) (insurer must have denied claim for "legitimate or arguable reason" or "debatable reason," which means "open to dispute or question"  e.g., where insured may have committed suicide and, as a consequence, nullified application of insurance policy); Casson v. Nationwide Ins. Co., 455 A.2d 361, 369 (Del. Super. Ct. 1982) (denial must be for "reasonable justification" or because "bona fide dispute existed"  e.g., where insurer's questions remained unresolved because insured refused "to undergo certain diagnostic procedures and rehabilitative measures"); Interstate Life & Accident Ins. Co. v. Hopgood, 133 Ga. App. 6, 8, 209 S.E.2d 703, 705 (1974) (denial must be based upon "reasonable and probable cause"  e.g., (inferring) where insurer questioned the cause of the insured's death).
[13] Conceivably, upon presentation of sufficient proof, consequential or extra-contractual damages (e.g., reasonable attorney fees, court costs, and other economic losses) may be awarded in cases involving a lack of a reasonably arguable basis  notwithstanding that the insurer is not liable for punitive damages. Cf. Maas, 516 So.2d at 498 (Robertson, J., concurring); Pioneer Life Ins. Co. of Ill., 513 So.2d at 931 (Robertson, J., concurring); id. at 932 (Sullivan, J., specially concurring); Day, 487 So.2d at 835; Blue Cross & Blue Shield, Inc., 466 So.2d at 845 (Hawkins, J., denying petition for reh'g); Wright v. Stevens, 445 So.2d 791 (Miss. 1984).