# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-00048-SCT

*UNITED AMERICAN INSURANCE COMPANY*

*v.*

*NATALIE MERRILL*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/05/2005 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | JASPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SAM STARNES THOMAS |
| | EDDIE JACOB ABDEEN |
| | WILLIAM J. BAXLEY |
| | RANCE N. ULMER |
| | FLOYD D. GAINES |
| ATTORNEYS FOR APPELLEE: | CHRISTOPHER COLLINS VAN CLEAVE |
| | CLYDE H. GUNN, III |
| | JOHN LEONARD WALKER, JR. |
| | PHILLIP J. BROOKINS |
| | D. NEIL HARRIS, SR. |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 09/06/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     This appeal is brought by United American Insurance Company ("United") after the

beneficiary of one its life insurance policies, Natalie Merrill ("Natalie"), filed suit against it

and its agent, resulting in a jury verdict against United.

¶2.    On September 11, 1996, Natalie and her husband, Robert Merrill ("Robert"), residents of Gautier, purchased a United life insurance policy through an agent, Fannie Triplett ("Triplett"). The policy guaranteed the designated beneficiary, in this instance Natalie, $5,000 upon the insured's death, in this instance Robert. When Natalie did not receive the promised benefits of this policy, she was forced to take out a loan to pay for Robert's funeral. In order to satisfy the loan obligation, Natalie, at age 71, was required to take a job at the Boomtown Casino working the graveyard shift.

¶3.    All premiums for the life insurance were timely paid. On May 20, 1997, Robert suffered a fatal heart attack and died at his home. Natalie followed the procedures specified by United for processing her claim for the promised benefits. United preliminarily denied Natalie's claim for policy benefits by correspondence first on December 4, 1997, and then again on January 7, 2000, claiming the policy was void *ab initio,* based on alleged material misrepresentations made by Robert during the application process.

¶4.    Natalie filed suit on July 24, 2000, in the residence county of United's agent, Triplett. The Complaint named as defendants United, Triplett and unknown employees of United. The Complaint averred the defendants engaged in numerous acts of fraud and negligence, including, but not limited to: fraud in the inducement of the purchase of the policy, delay in processing the claim, negligent failure to properly and timely investigate Natalie's claim, negligent training and supervision of United employees, negligent failure to provide a reasonable basis for denying Natalie's claim for benefits in relation to the insurance policy, and finally, conscious, gross and reckless disregard for the rights of Natalie, including attempting to use Natalie's emotional instability and financial dire straits to induce her to

2

accept a return of premiums paid. The Complaint further averred that United and its agents, including Triplett, committed the tort of outrage by engaging in behavior that would shock the conscience of a reasonable person. Additionally, Natalie sought punitive damages as "the misrepresentations, omissions and concealment of material facts were intentional and deliberate and were part of a willful scheme or course of conduct."

¶5.     United removed the case to federal court claiming fraudulent joinder. Natalie filed a Motion to Remand. The United States District Court for the Southern District of Mississippi, Eastern Division, issued an Memorandum Opinion and Order granting Natalie's Motion to Remand based on United's failure to demonstrate Triplett was fraudulently joined.

¶6.     United filed its Answer and Defenses alleging that it acted in good faith at all times regarding Natalie's claim and that the life insrance policy was void *ab initio* because of material misrepresentations Robert had made about his health. Further, United alleged Natalie's claim for punitive damages violated the United States and Mississippi Constitutions.

¶7.     Triplett filed an Answer and Cross-Complaint against United. Triplett averred that at all times, she acted in the course and scope of her employment with United, and "would show that her acts with regard to the sale of the United insurance products were at all times in conformance with the instruction and training she was given by United." Triplett further denied she acted wrongfully or intentionally or with such reckless disregard as to entitle Natalie to punitive damages from her.

¶8.     In her cross-complaint, Triplett further averred that if she was found to be liable to Natalie, then United would be liable to her, as all of her acts were in accordance with the

3

training and supervision she received from United. Triplett alleged that United, through its supervisory personnel, promoted and encouraged deceptive sales practices in order to increase sales. Triplett additionally pleaded that United fraudulently conceals from its agents material facts regarding United's products and its deceptive sales practices. Triplett stated that United "repeatedly enhances its sales figures and reaps enormous sums of profit at the expense of the business and personal reputations of Triplett and other agents so recruited." Triplett claimed she suffered anxiety, worry, mental and emotional distress as a result of her friends, family and community believing she misled them in her sales practices. Triplett claimed she should be indemnified by United, as United had a duty to properly defend Triplett as their agent. She stated the acts committed by United were intentional, willful and grossly negligent and that she was entitled to compensatory and punitive damages, as well as indemnification for her attorney's fees and expenses.

¶9.    United not only filed a Separate Answer and Defenses to Triplett's cross-complaint, but also filed a counterclaim against Triplett. United claimed it acted in good faith at all times regarding Triplett and additionally, that her claims for punitive damages were in violation of the United States and Mississippi Constitutions. In its counterclaim, United stated that if it was determined by the court that Triplett was an agent for United, then Triplett was liable for breach of fiduciary duty she owed to United.  Triplett filed an Answer to United's counterclaim which reiterated the averments from her cross-complaint.

¶10.    Trial was set for February 11, 2003. Discovery ensued, with United and Natalie each continually and acrimoniously accusing the other of gross discovery violations, which will be discussed *infra*.

4

¶11.    On December 5, 2002, United filed a Motion for Withdrawal and Substitution of Counsel. Natalie filed a Response in Opposition to this motion, saying it would cause an unnecessary delay in trial. However, the motion was granted by the trial court.

¶12.    On December 19, 2002, Natalie filed a Motion for Sanctions, and in the Alternative, Motion to Compel United to fully respond to Natalie's discovery requests. Further, Natalie filed a Motion to Quash or in the Alternative, a Protective Order, as she believed United filed improper medical records subpoenas. In its Response, United argued the terms of the policy did not govern and/or restrict the medical records to which they were entitled, but that Mississippi Rule of Civil Procedure 26(b)(1) did. A hearing took place on these motions and the Motion for Sanctions was granted by the trial court.

¶13.    United then filed a Motion for Continuance, which claimed discovery was delayed due to the removal to federal court. This Motion was granted by the trial court and trial was reset for May 19, 2003.

¶14.    Subsequently, the parties agreed to delay trial a third time and chose a trial date of October 13, 2003. On September 2, 2003, United filed a Motion for Leave to Amend its Answer to the Complaint and Cross-Complaint. In its Motion, United pleaded that if allowed to amend its Answer, it would assert new defenses, but that these amendments would not unfairly surprise or prejudice Natalie or Triplett in any way.

¶15.    United sought leave to amend its Answer to address the United States Supreme Court's decision regarding punitive damages in *State Farm Mutual Auto Insurance v. Campbell,* 123 S.Ct. 1513, 538 U.S. 408, 155 L.Ed.2d 585 (2003) and to permit an additional affirmative defenses against Natalie of accord and satisfaction, claiming Natalie cashed a

5

check from United refunding premiums and further, that Natalie was not the real party in interest and lacked standing to bring this claim. An additional defense asserted against Triplett was that due to a scrivener's error, United erred in replying to Triplett's Requests for Admission. Triplett and Natalie responded that the Motion to Amend, which was made forty-five days before trial, was not timely and that they would suffer actual prejudice if United were allowed to amend. However, the trial court granted United's Motion to Amend.

¶16.    United then filed a Motion for Continuance, claiming its experts were unable to attend trial. A continuance was granted by the trial court and trial was reset for the fourth time for December 29, 2003.

¶17.    On December 8, 2003, United filed requests to issue eleven subpoenas. The next day, United filed yet another Motion for Continuance due to the unavailability of a witness. On December 11, 2003, the trial court heard the Motion for Continuance. Natalie claimed this Motion for Continuance addressed only the unavailability of the expert and not the need for the information from the eleven subpoenas which had been served. Natalie further claimed that at the time of the hearing, she had not yet received notice of the service of the eleven subpoenas. Continuance was granted due to the unavailability of the witness, and trial was rescheduled for February 9, 2004, the fifth trial setting. Subsequently, after Natalie discovered the issuance of the eleven subpoenas, on December 23, 2003, Natalie filed a Motion to Quash, or in the Alternative, for a Protective Order.

¶18.    Due to medical reasons of one of the counsel involved, the trial was again continued. Trial was reset for August 2, 2004, the sixth trial date.

¶19. On January 27, 2004, Triplett filed a Motion to Withdraw Certain Claims. Triplett withdrew any allegation contained within her Cross-Complaint that dealt with her standing in her community.

¶20. On July 20, 2004, United filed its Response to Natalie's Motion to Quash the documents received from the eleven subpoenas issued on December 8, 2003. Natalie alleged that United made no effort to access the records and information from the subpoenas prior to its Response on July 20, 2004.

¶21. On July 23, 2004, the trial court heard argument on Natalie's Motion to Quash and granted it, but allowed United to proffer the records currently in its possession.

¶22. On July 26, 2004, Natalie filed motions in limine and motions to strike and exclude expert testimony based on United "trying, for the first time, after years of litigation, to offer opinion testimony from several cardiologists about what they think Robert should have been diagnosed with. . . ." Natalie argued to exclude any evidence of Robert's previous health or any evidence of medical information of which Robert was unaware. Natalie's motions in limine, motion to strike and motion to exclude were preliminarily denied, but the trial court allowed that these motions could be renewed at the time of the witnesses' testimony, during their testimony and at the conclusion of their testimony.

¶23. Trial began on August 2 and ended on August 6, 2004. The trial was bifurcated, and after the jury awarded compensatory damages, a separate hearing was conducted on punitive damages. The verdicts of the jury were as follows:

1) For Natalie against United, $500,000 in compensatory damages.
2) For Triplett against United, $250,000 in compensatory damages.

3) For Natalie against United for United's bad faith breach of contract, $900,000 in punitive damages.
4) For Triplett against United, $900,000 in punitive damages.

On August 13, 2004, Natalie filed a Motion to Amend the Pleadings to Conform to the Evidence and for Award of Attorney's Fees. United responded and Natalie subsequently filed a rebuttal to United's Response. The trial judge included his ruling on these motions in the Order of Final Judgment.

¶24. While not conceding Natalie was entitled to attorney's fees and expenses, United *stipulated* that the amount of attorney's fees and expenses she submitted was reasonable. The trial court ruled that Natalie was entitled to attorney's fees and expenses and accepted that the stipulated amount was reasonable.

¶25. The trial court entered judgment for Natalie on the jury verdict, plus attorney's fees and expenses and post-judgment interest on the total at 8% per annum. Judgment was entered for Triplett on the jury verdict, plus post-judgment interest, also at 8% per annum on the total.

¶26. On September 22, 2004, United filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for New Trial or Remittiturs, to which Natalie and Triplett, individually, filed responses. The trial court denied United's Motion for Judgment Notwithstanding the Verdict, as well as United's Motion for New Trial. However, the trial court granted the Motion for Remittitur for compensatory and punitive damages as to Natalie and Triplett and for punitive damages as to Triplett.

¶27. The trial court found Triplett proved her attorney's fees were $75,000. The trial court found that she failed to prove any other damages and reduced her compensatory damages to

8

$75,000. Citing **State Farm v. Campbell,** the trial court calculated that nine times Triplett's compensatory damages was $675,000, and accordingly reduced Triplett's punitive damages award to $675,000.

¶28.    Citing this Court's decision in **Stewart v. Gulf Guaranty Insurance Co.,** 846 So.2d 192 (Miss. 2002), the trial court analyzed the compensatory damage award to Natalie and found it excessive in light of the overwhelming weight of the evidence. The court reduced Natalie's award of compensatory damages to $200,000.  The trial court further found: "As much deference as possible should be given to the jury's verdict; since nine times Ms. Merrill's compensatory damages (after the remittitur) exceeds the punitive damage award set by the jury, the punitive damage award to Ms. Merrill will stand as the jury determined."

¶29.    Natalie accepted the remittitur pursuant to Miss. Code Ann. Sect. 11-1-55 (Rev. 2002). Natalie accepted the remittitur for the sole purpose of facilitating a final judgment, but did not waive her right to cross-appeal in the event United appealed the final judgment.

¶30.    Subsequently, Triplett filed an Affidavit on Judgment Satisfaction, authorizing the clerk of the circuit court to mark the judgment satisfied and canceled "as it pertains to relief granted in favor of cross-claimant Fannie L. Triplett and against cross-defendant, United American Insurance Company. . . ."

¶31.    On January 5, 2005, the trial court entered a Judgment of Dismissal with Prejudice as it pertained to Triplett's claims. The judgment stated that all of Triplett's claims against United should be dismissed with all parties bearing their own costs.[1]

---

[1]Triplett is not a party to this appeal.

9

¶32. The trial court entered final judgment in favor of Natalie on January 5, 2005. The final judgment recited that Natalie should recover from United: 1) $200,000 in compensatory damages; 2) $900,000 in punitive damages; 3) $527,474.69 in attorney's fees and expenses; and 4) post-judgment interest of 8% per annum on the total judgment. It is from this judgment that United appeals.

¶33. United presents the following issues for appeal:

    I.    Whether the trial court erred in failing to grant United's Directed Verdict Motion, Peremptory Instruction, and Motion for Judgment Notwithstanding the Verdict.

    II.    Whether, alternatively, a new trial is in order because the trial court erred in denying the use of medical records of Robert at trial and in denying United's Motions for a Mistrial or Continuance; erred in instructing the jury; and erred in evidentiary rulings.

    III.    Whether the trial court erred procedurally and substantively in submitting to the jury any extracontractual/punitive damages issues.

### FACTS OF THE CASE

¶34. Robert Merrill was a veteran who was employed by the Pascagoula Port Authority as a security guard until his death at age 68. Natalie testified Robert was in good health and sprits until his death. Robert decided to obtain insurance for final or burial expenses. Robert informed Natalie that Triplett would visit them at their home to sell them this insurance.

¶35. Triplett was an employee of Parker and Associates. Parker and Associates was an affiliate of United, and Ken Parker was United's General Agent for the State of Mississippi. Parker and Associates sent out mailings and advertised on television and received calls from the general public. A member of the public would telephone Parker and Associates to inquire

10

about insurance, and then Parker and Associates would send an agent to the inquirer's home. The agent recommended a certain type of insurance, and if the agent made the sale, the agent receive his or her commission from Parker and Associates, as well as from the insurance company, which in this case was United. If the agent did not make the sale, they received no compensation. Gene Grimland ("Grimland"), United's President of the General Agency and Marketing Division, testified that Triplett had authority to talk to the Merrills, solicit the sale of United's policy and fill out the application on behalf of United.

¶36. Triplett testified she received little or no training to sell insurance. She stated that on her first day, she went out with another agent and observed him, but on the second day, she was on her own. Triplett testified she also attended a workshop at Parker and Associates, which took place nine months after she began working for the company. United told her "to push, push, push to bring money in." Triplett testified that she was concerned that she was allowed to "go out there just foot free and loose."

¶37. On September 11, 1996, Triplett visited the Merrills at their home. Natalie testified that Triplett recommended the United policy. United later issued a policy for $5,000 insurance on Robert's life, with Natalie as the beneficiary. The insurance application consisted of eight health-related questions, which were to be answered simply "yes" or "no." Grimland testified that this type of insurance is a very "liberal application," and "that there are a lot of diseases you can have and still be insured by this," so the "prices are higher than normal life insurance."

11

¶38. Natalie and Triplett both testified that Triplett asked Robert the questions which were printed on the insurance application. Triplett read the questions to Robert and recorded his answers. Triplett further testified no one ever explained to her what these questions meant.

¶39. The only writing by Robert on the form was his signature at the bottom of the application. While they were going over the questions on the application, Natalie testified that Robert told Triplett he had had heart bypass surgery in 1978 and 1979 and showed her his scar from these surgeries. Natalie further testified that Robert told Triplett he still went for checkups for his heart. Natalie testified that Triplett told Robert that these problems took place so long ago that they did not matter, and that United inquired back only three years. Therefore, to question six on the application, Robert responded "no."[2] Triplett made no notation on the application that Robert had disclosed past heart problems to her.

¶40. Triplett testified that she told the Merrills that if Robert were to die, Natalie would be paid the policy benefit thirty days after she sent in the death certificate, because that is what she was told by United. It was Triplett's testimony she was instructed by United to tell potential applicants that "someone always pays." There was a two-year Incontestability Clause contained within the policy which was later issued, in which United reserved the right to deny claims on certain bases if the insured died within two years. Triplett testified she was not told by United about an Incontestability Clause, nor did she relay any information about it to the Merrills.

---

[2]The specific question asked on the application: "Within the past three years, has the proposed insured had or been treated for a heart attack, congestive heart failure, stroke or been advised to have surgery for a heart condition or for any blood vessel disease but not had such surgery."

¶41.    Based on the answers Robert provided her, Triplett marked "no" to each of the medical questions contained on the application  A representative for United, employed by its parent, Globe Life Insurance, Sandra Whitaker ("Whitaker"), testified that if all questions on the application were answered "no," then United made no further request for additional medical records or information at the time of application, and that United conducted no underwriting before accepting an application. Whitaker stated,  "We rely on the responses provided on the application."

¶42.    United's marketing materials for its policy stated, "Your Protection Can *Never* Be Cancelled As Long As Premiums Are Paid On Time." (Emphasis contained in original).  The Merrills timely paid each of their premiums. The premiums were $50 a month and Robert authorized an automatic bank draft. However, in a discovery deposition it was determined that United was drafting $54 a month rather than $50.  $54 is the amount one would pay if they were billed directly by mail.  United claimed it was a mistake and that all premiums were refunded in full.

¶43.    On May 30, 1997, United received notice of Robert's death in the form of a copy of the death certificate, stating the cause of death to be a myocardial infarction due to hypertension, a consequence of a history of bypass surgery.  For more than eight months, from May 30, 1997, until March 2, 1998, United collected Robert's medical records.  In the interim, on September 22, 1997, United wrote a letter to Natalie stating it needed additional time to review Robert's medical records before it could process her claim.

¶44.    By letter, Natalie authorized United to obtain Robert's medical records for the preceding *five* years.  However, United sought and obtained records only from September

13

of 1993 until September of 1996, the three years preceding the application. United specifically inquired of Robert's treating physicians if he had ever been treated for congestive heart failure and each of these physicians answered "no."

¶45. Notwithstanding the response of Robert's physicians, United's underwriting department (none of whom have any medical training), its medical director and a cardiologist, hired by United for trial who never treated Robert, concluded that Robert's death was the result of congestive heart failure. The medical director for United, Dr. Stanley McCampbell ("Dr. McCampbell"), opined the medical records *indicated* Robert had congestive heart failure. (Emphasis added). Dr. McCampbell conceded on cross-examination that none of the records from Robert's treating physicians included the words or contained a diagnosis of "congestive heart failure." He also testified that had *he* been treating a patient with congestive heart failure, he would have written "congestive heart failure" in his medical record. Dr. McCampbell, as well as Dr. Malcom Taylor, an expert separately retained by United for trial, testified Robert's records revealed he had been taking Lasix and Lanoxin, which in Dr. Taylor's words, are the "classic drug regimen" for congestive heart failure. Dr. Eva Magiros, Robert's cardiologist, and Dr. Robert Holbert, Robert's treating physician, whose records United obtained, disputed the opinions offered by the experts hired by United. Both treating physicians testified they were *not* treating Robert for congestive heart failure. Dr. Holbert further testified Robert was taking Lasix and Lanoxin to reduce his salt and water balance, and not for treatment of congestive heart failure.

¶46. Vicky Lawrence ("Lawrence"), testifying on behalf of United, testified that nowhere in the medical records contained in the claims file were the words "congestive heart failure"

14

mentioned. Lawrence further testified that after reviewing the claims file several times, she could not find any evidence that revealed any of the doctors told Robert he had congestive heart failure. In addition, Natalie testified she was never advised that her husband was being treated for congestive heart failure.

¶47.    United's denial was allegedly based on Robert's answer of "no" to the application question of whether he had been treated for congestive heart failure during the previous three years, claiming Robert's response was a material misrepresentation to United. Whitaker stated the sole reason for denial of the claim was this alleged material misrepresentation.

¶48.    An attorney for United had advised the life claims department to contact Triplett and Natalie before formally denying the claim. On December 4, 1997, United sent a letter to Natalie stating it had determined Robert had failed to disclose past medical history. United asked Natalie to submit any comment on Robert's medical history and advised that no further action would be taken on the claim until she did. After receiving no response, United sent a second letter to Natalie, reiterating its position and inviting comment from Natalie. Natalie did not respond. At trial, Natalie testified she was too distraught to respond and in a "stoop" after her husband's death. United asserted it was unable to contact Triplett. Although United had Triplett's social security number, United asserted it did not have a correct address for Triplett after she was terminated from the company for reasons not disclosed in the record. United claimed it sent Triplett two letters.

¶49.    Finally, on March 2, 1998, 278 days after Natalie's claim was filed, and 286 days after Robert's death, United sent a letter to Natalie formally denying her claim and refunding the premiums paid. Natalie later cashed this check. Natalie testified she was not aware that by

15

cashing the check she was waiving any claims, and she still believed United owed her the policy proceeds. Natalie claimed since she had not received any money from United for such a long period, she was not financially stable and needed the money so as not to get behind on bills. The check was payable without any restrictions.

¶50.    In November of 1999, United received a letter from Natalie addressed to Triplett wherein Natalie inquired why her claim was denied. Due to United not having Triplett's current address, the letter was not forwarded to her. On December 9, 1999, Natalie wrote to the president of United to ask why her claim was denied. Whitaker testified the president did not personally see it, but that the letter was reviewed and filed in the Merrill claims file. On January 7, 2000, United sent a letter in response to Natalie. The letter stated United had once again reviewed Robert's medical records and was denying the claim. However, Whitaker testified that before this letter was sent, United made no effort to obtain any new medical records or information.

¶51.    At trial, Natalie testified that because of the denial of the claim, she was forced to take out a loan to pay Robert's burial expenses of $5,583.00. Natalie made payments of $136.82 a month on the loan, and at the time of trial had paid $369.47 in interest. She stated she paid this loan for a period of forty-eight months. Natalie testified that it was necessary for her to work to pay off the loan. Natalie, age 71 at the time of trial, worked the graveyard shift at the Boomtown Casino from 11:30 p.m. to 7:30 a.m. Natalie testified she worked forty hours a week at the casino. Natalie testified she was "under great stress" trying to pay her bills and that she had seen a doctor because of "stress" and "nervousness." Natalie testified she further suffered anxiety when United sent two agents to her home *after her claim had been denied*

16

to tell her that her policy had lapsed due to unpaid premiums. Natalie testified it made "her feel bad because they didn't pay me in the first place, and then they come sending their men to my door." Natalie further testified this lawsuit caused her anxiety and was "upsetting her."

**ANALYSIS**

I.  **Whether the trial court erred in failing to grant United's Directed Verdict Motion, Peremptory Instruction, and Motion for Judgment Notwithstanding the Verdict.**

¶52.    "Our standard of review of a trial court's grant of a J.N.O.V., a peremptory instruction and a directed verdict is de novo. . . ." *White v. Stewman,* 932 So. 2d 27, 32 (Miss. 2006). "In essence, judgments as a matter of law present both the trial court and appellate court with the same question – whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Id.*

¶53.    United's letter to Natalie on March 2, 1998, stated that since Natalie had not responded to its previous correspondence, United was forced to rely on the medical information it had, which showed Robert had congestive heart failure that was not disclosed to United. However, the evidence revealed that this was a false statement. The letter stated, "[W]e have no choice but to rely on the information contained in our file and take the necessary steps to return all premiums paid for Mr. Merrill's policy. Our check is enclosed. Again, this action is necessary since we would have been unable to approve Mr. Merrill for coverage under this plan. . . ."

17

¶54. United did not assert the affirmative defense of accord and satisfaction in its original Answer. United moved to include this defense in its Amended Answer, two years after its original Answer was filed, three years after the suit was filed by Natalie, and six years after Robert's death. Nevertheless, the trial court allowed it over Natalie's objection.

¶55. At the end of Natalie's case, United moved for a directed verdict, which was denied by the trial court. United argues that it should have been granted a directed verdict, peremptory instruction, or JNOV, because Natalie cashed the refund check from United. It is United's contention that cashing the refund check represents mutual rescission and/or accord and satisfaction of the claim. Natalie points out that United did not plead this defense in its Answer; therefore this defense was waived.

¶56. When denying the directed verdict, the trial judge stated, "Though I am overruling *in toto* the defendant's Motion for JNOV. . . , I am concerned that the plaintiff might have some *Oglesbee* problems.[3] In such situations, though, I believe the defendant must affirmatively show that the plaintiff knew she waived all her claims – if she did. We'll see what the Supreme Court says."

¶57. This Court has defined the elements of accord and satisfaction as:

> (1) Something of value offered in full satisfaction of a demand;
> (2) accompanied by acts and declarations as amount to a condition that if the thing offered is accepted, it is accepted in satisfaction;
> (3) the party offered the thing of value is bound to understand that if he takes it, he takes subject to such conditions; and
> (4) the party actually does accept the item.

---

[3] *Oglesbee v. National Security Fire and Cas. Co.,* 788 F. Supp. 909 (S.D. Miss. 1992).

***Medlin v. Hazlehurst Emergency Physicians***, 889 So. 2d 496, 498 (Miss. 2004) (citations omitted).

¶58.    United unpersuasively argues that Natalie met all elements of this test, as she received the check on March 2, 1998, and cashed the check on April 24, 1998. Even though United presented no evidence that this check indicated it was for satisfaction of all claims, United argued Natalie should have been aware this check was in satisfaction of her claim, as she had knowledge the policy was being cancelled and that she further had knowledge she could consult with an attorney.

¶59.    Natalie argues she does not meet this Court's requirements for accord and satisfaction. Natalie contends she neither believed nor understood that cashing the check would serve as release or waiver of her claim.

¶60.    Neither the letter from United, nor the refund check, establish that the check was in satisfaction of the claim. United did not converse with Natalie at any time before issuing the check. Natalie testified she cashed the check because she was behind on her bills and she still believed United owed her the money from the claim. Subsequent to cashing the check, Natalie wrote the letters to Triplett and the President of United asking why her claim had not been paid.

¶61.    Additionally, Natalie argues contrary to United, that she did not consult a lawyer *before* cashing the check. Whether Natalie consulted a lawyer about the consequences of cashing the check is not made clear by the record. During trial Natalie was asked, "Do you remember testifying at your deposition, Ms. Merrill, that you didn't talk with anybody other than your lawyers when you cashed that check?" Natalie answered, "Right."

19

¶62. Based on the record before this Court, it is clear Natalie did not intend, nor did she fully understand cashing the check would constitute a waiver of her claim against United. "As clearly required by the first three elements of a valid accord and satisfaction, there must be a 'meeting of the minds of the parties.'" ***Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.,*** 857 So.2d 748, 754 (Miss. 2003) (citations omitted). In the case sub judice, there clearly was no "meeting of the minds" between Natalie and United. This Court further held in ***Chandeleur,*** "[T]hat an obligee may execute a valid accord and satisfaction by cashing checks which were offered as full satisfaction of a demand." ***Id.*** (citations omitted). In United's correspondence to Natalie, there was no statement, or for that matter, any notice that United intended the check to be full satisfaction of the demand. Furthermore, the letter enclosed with check stated, "If you have information which you feel would materially affect this decision . . . please let us know." Thus, the letter encouraged a continuing dialogue between Natalie and United, as opposed to declaring that acceptance of the premium refund would satisfy the demand. *See **Medlin***, 889 So. 2d at 498.

¶63. Additionally, the jury found that Natalie's cashing of the check did not constitute accord and satisfaction, and this Court has held, "[a] jury should be allowed to decide the issue of whether a release was obtained in good faith and with the full understanding on the plaintiff's part of his legal rights." ***Id.*** (citations omitted). The elements of a valid accord and satisfaction and/or mutual rescission were not met, and the trial court did not err in denying United's directed verdict motion, peremptory instruction, and motion for judgment notwithstanding the verdict.

**II.** **Whether, alternatively, a new trial is in order because the trial court erred in denying the use of medical records of Robert at trial and in denying United's Motions for a Mistrial or Continuance; erred in instructing the jury; and erred in evidentiary rulings.**

**A.** **Did the trial court err when it denied United the use of certain medical records at trial?**

¶64.   "Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." ***Haggerty v. Foster***, 838 So. 2d 948, 958 (Miss. 2002) (citations omitted).  "Furthermore, where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" ***Id.***

¶65.   In a pretrial hearing, the judge stated United was only to gather medical records for "whatever the policy allowed them." The policy application requested medical information for the previous three years. The judge further stated, "I would say [gather] congestive heart failure records for that three year period."

¶66.   Subsequently, United issued eleven subpoenas to medical providers. These subpoenas, which sought additional records, were not issued until six years after United denied Natalie's claim.  Natalie filed a Motion to Quash these eleven subpoenas.[4]  On July 23, 2004, a hearing was held on Natalie's Motion to Quash.  The trial judge granted Natalie's Motion to Quash, but allowed United to make a proffer of the records in its possession.

---

[4]Although this Motion was filed previous to the January 7, 2003, hearing, this Motion was not heard until July of 2004.

¶67. United argues it was denied the use of these relevant medical records at trial. United states the records that were not admitted into evidence would prove that Robert was treated for congestive heart failure.

¶68. In its correspondence to Natalie, as well as through the depositions of its representatives, United stated the reason for denial of the claim was that it "received medical information indicating undisclosed medical history of congestive heart failure within the three year period prior to application." The medical records in the claims file were from doctors whom Natalie disclosed to United at its request while it was investigating Natalie's claim. United asserts, and Natalie concedes, that it requested and was given authorization by Natalie to obtain the medical records for *five* years. However, only records from the prior three years were requested from these physicians before Natalie's claim was denied. Whitaker, United's representative, testified the denial of Natalie's claim was based on the following, which was contained in Robert's claim file: the medical records from Dr. Eva Magiros, Dr. Robert Holbert and the Biloxi Medical Center. An employee of United, who had no medical training, reviewed these medical records, none of which included a diagnosis of "congestive heart failure." Notwithstanding the absence of a diagnosis, this employee decided Robert had had congestive heart failure within three years prior to his application and forwarded the claim to United's legal department and medical director for review.

¶69. As discussed *infra,* United's medical director, Dr. McCampbell, opined that Robert's medical records *indicated* congestive heart failure. A thorough review of the record for any substantiation of this conclusion by Dr. McCampbell cannot be found. Dr. McCampbell never contacted Robert's treating physicians, nor did he offer any reason, basis or fact to

22

support his opinion that Robert had been treated for or diagnosed with congestive heart failure during the three-year period preceding application.

¶70.    An insurance company must present an arguable, good-faith basis for denial of a claim.  *See **State Farm Ins. Co. v. Grimes,*** 722 So. 2d 637 (Miss. 1998); ***Standard Life Ins. Co. v. Veal,*** 354 So. 2d 239 (Miss. 1977).  The record before us is devoid of any such basis. Every medical document for the three-year period preceding application contradicts the opinion of Dr. McCampbell.  Accordingly, there is no proof of a good-faith basis for denial. Insurance companies are not free to employ medical directors who are in a position to recommend arbitrary denials. A medical opinion put forth by a medical director, without substantiation, is insufficient to deny a claim. Insurance companies must comply with the mandate of this Court to demonstrate an arguable basis for denial.

¶71.    Additionally, Natalie argues that certain records were properly excluded, as the denial of the claim was based on whether Robert had congestive heart failure within the three years prior to the application for insurance. Natalie states these additional, subpoened records were not the medical records which were contained in Robert's claim file and relied upon to deny her claim.

¶72.    The medical records at issue exceed the three-year time period which is stated on the application. With one exception,[5] the medical records not admitted by the trial court range in date from May 1989 to September 1991, well before the 1996 application. The letter of

_____

[5]One of the subpoenas issued was to Dr. David Witty, who treated Robert on December 16, 1994. None of the records from Dr. Witty stated Robert had congestive heart failure.

denial to Natalie clearly stated the denial was based on evidence of congestive heart failure from the medical records United possessed from the preceding three years. While this Court is confronted with multiple issues in this appeal, the issue of the basis for the denial of Natalie's claim is the most pertinent to our ruling. The medical records excluded were not utilized to deny Natalie's claim, nor do they provide evidence Robert suffered from or was treated for congestive heart failure from 1993 to 1996.

¶73. Evidence is always subject to the test of relevancy. In this case, the relevant records are the records upon which denial was based. As this Court does not want to favor suppression of discovery, we find the trial court erred in relying upon the *policy period* solely to determine which records should be excluded. We find the conduct of United should have been considered when determining which records were relevant. The relevancy of medical records was evidenced by United's pre-suit conduct. "An insurance company has exclusive control over evaluation, processing and denial of claims." ***Andrew Jackson Life Ins. Co. v. Williams***, 566 So. 2d 1172, 1189 (Miss. 1990). United requested authorization to obtain records from the preceding five years, but this Court is befuddled by United's complaints about exclusion of the older records, given its decision to obtain only records from the preceding three years. As this is a lawsuit based on the denial of Natalie's claim, and United chose to base its denial only on the preceding three years, then United must be satisfied to use records from these three years to defend its denial.

¶74. At trial, United attempted to offer an alternative argument for denial of Natalie's claim. Even though United's employee, Whitaker, testified that question six of the application was the only issue, United attempted to create an additional basis for denial based

24

on application question eight at trial.[6] In the medical records which were excluded, United claimed there was information that Robert had been treated for cancer. A record dated August 13, 1990, from Dr. David Witty stated a "carcinoid tumor" was found in Robert's small bowel. However, Natalie disputes this was cancer and stated the tumor(s) were polyps which were removed from Robert's colon during a colonoscopy. While the trial judge denied United the use of these records, he reserved the right to reverse this ruling and allowed United to retain an expert to define and explain "carcinoid tumor." United failed to do so. Additionally, United never sought medical records regarding cancer prior to its denial of Natalie's claim.

¶75.    As United did not base its denial of the claim on question eight of the application, nor did United utilize its opportunity to put on proof of carcinoid tumors at trial, the issue of the exclusion of these records is moot.

¶76.    No proof was put forth to support the denial of Natalie's claim, nor were the excluded records utilized in the decision to deny Natalie's claim. While we find the trial court did not employ the correct reasoning for the exclusion of these records, we find the records were properly excluded from evidence.

### B.    Did the trial court err in instructing the jury?

¶77.    United claims the trial judge erred in granting numerous instructions. Natalie argues that "while, perhaps not perfect, the trial court's instructions, taken as a whole, certainly do not constitute reversible error.

---

[6]Question eight states: "Within the past ten years, has the proposed insured been diagnosed as having, or received treatment for internal cancer?" Robert answered "no."

¶78. "When we review a claim of trial court error in granting or denying jury instructions, we are required to read and consider all of the jury instructions together as a whole." ***Burr v. Mississippi Baptist Medical Center,*** 909 So. 2d 721, 726 (Miss. 2005) (citations omitted). "No instruction should be taken out of context or read alone in isolation." ***Id***. ***Richardson v. Norfolk & Southern Ry.***, 923 So. 2d 1002, 1010 (Miss. 2006) (citations omitted). "If all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." ***Milano v. State,*** 790 So. 2d 179, 185 (Miss. 2001). Additionally, "with any granted jury instruction challenged on appeal, two questions are necessarily implicated: Does the instruction contain a correct statement of the law?, and Is the instruction warranted by the evidence?" ***Hill v. Dunaway,*** 487 So. 2d 807, 809 (Miss. 1986).

¶79. United claims that granting instructions P-9, P-10, and P-11[7] over its objections was error and that these instructions were contrary to law and to the proof presented. Although the instructions may have been contrary to United's theory of the case, the instructions are correct statements of the law and were supported by Natalie's proof.

¶80. United also submitted P-11 would confuse a jury. P-11 instructed the jury that United may be liable for actual damages for the actions of its agent. United asserts that the statement in the policy which read, "We are not bound by any promise or representation made by an

---

[7]Instruction P-9 primarily addressed the law of material misrepresentation, burden of proof and imputed knowledge; Instruction P-10 addressed imputed knowledge; and Instruction P-11 peremptorily instructed that Triplett was United's agent.

agent or anyone else" exempted it from being held liable for the actions of Triplett when she sold the policy to the Merrills.

¶81. Grimland stated Triplett had the authority to act on behalf of United. There is sufficient proof to show Triplett was acting on behalf of United. Furthermore, according to the law of this state, the policy language cannot limit the responsibility of United. "We and other courts have held insurers to be bound by the actions of their agents acting within the course and scope of apparent authority *regardless of the policy's actual terms*." ***American Income Life Ins. v. Hollins,*** 830 So. 2d 1230, 1237 (Miss. 2002) (emphasis added). Accordingly, Instructions P-9, P-10 and P-11 were properly given by the court.

¶82. United also submits that the granting of Instruction P-26 and the refusal of its Instruction DUA-14 at the conclusion of the compensatory phase was error. Instruction P-26 stated, *inter alia*, that if the jury found United breached the contract, that the jury could consider the mental pain, anxiety and emotional distress when determining the award. Instruction DUA-14 stated the jury could not find for Natalie in any amount beyond reasonable compensation for actual damages sustained, if any. This was covered by the other instructions of the court.

¶83. At trial, United objected to P-26 asserting "Mississippi law. . . would not allow recovery of mental anguish and emotional distress damages for breach of contract alone, absent there being some additional element. . . ." Additionally, United argues this instruction is violative of Miss. Code Ann. Sect. 11-1-65 and this Court's recent decision in ***Hartford Underwriter's Insurance Co. v. Williams,*** 936 So.2d 888 (Miss. 2006).

¶84. Natalie argues that P-26 is proper under Mississippi law. Natalie asserts the trial was bifurcated by agreement of the parties, and that the jury was not instructed that it could consider punitive damages in the first, compensatory phase of the trial. The record supports the granting of Instruction P-26. United's reliance on *Hartford* is misplaced. In *Southwest Regional Medical Center v. Lawrence,* this Court held:

> This Court traditionally held that emotional distress and mental anguish damages are not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort. (citations omitted).
> In recent years this Court has moved away from this requirement.
> . . .
> In *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290 (Miss. 1992), we applied this rule to breach of contract cases stating:
> Some justices on this court have suggested that extra-contractual damages ought be awarded in cases involving a failure to pay on an insurance contract without an arguable reason even where the circumstances are not such that punitive damages are proper.[citations omitted]. Applying the familiar tort law principle that one is liable for the full measure of the reasonably foreseeable consequences of her actions, it is entirely foreseeable by an insurer that the failure to pay a valid claim through the negligence of its employees should cause some adverse result to the one entitled to payment. Some anxiety and emotional distress would ordinarily follow, especially in the area of life insurance where the loss of a loved one is exacerbated by the attendant financial effects of that loss. Additional inconvenience and expense, attorneys fees and the like should be expected in an effort to have the oversight corrected. It is no more than just that the injured party be compensated for these injuries. *Veasley*, 610 So. 2d at 295.

*Southwest Miss. Regional Medical Ctr. v. Lawrence*, 684 So. 2d 1257,1269 (Miss. 1996).

¶85. Consistent with this Court's holding in *Stewart,* 846 So. 2d at 200, Natalie presented proper evidence for compensation of emotional distress. The grant of Instruction P-26 and denial of Instruction DUA-14 were not error.

¶86. United further asserts the granting of Instruction P-21 was error. Instruction P-21 stated, *inter alia*, "If you find from a preponderance of the evidence that United American

28

failed to conduct a reasonably prompt and adequate investigation, and if you further find from a preponderance of the evidence in this case that its failure, if any, caused the denial of a valid claim, then your verdict may be for the plaintiff." The duty of United to reasonably investigate a claim is discussed *supra.* This instruction was properly supported by proof in the record, as well as by this Court's decision in ***Banker's Life and Casualty Co. v. Crenshaw,*** 483 So. 2d 254 (Miss. 1985).

¶87.    United asserts the trial court further erred in changing the word "must" to the word "may" in its Instructions DUA-7 and DUA-9. Other than because it was "fair" due to Natalie changing the wording in two of her jury instructions, the judge did not give a reason for changing the wording in these two instructions. While the instructions may not read "perfectly" due to the change, they do follow the "applicable rule of law," and therefore, do not result in error. *See **Milano,*** 790 So. 2d 179 at 185 (Miss. 2001). Furthermore, as to Instruction DUA-9, United did not object to changing the wording of this instruction and therefore, may not raise the issue on appeal. "Where a party fails to make a contemporaneous objection to a proposed jury instruction so that the trial court has an opportunity to cure the defect, we are procedurally barred from considering arguments that the trial court erred in submitting the instruction." ***Nunnally v. R.J. Reynolds Tobacco Co.***, 869 So. 2d 373, 378 (Miss. 2004) (citing ***Haggerty v. Foster***, 838 So. 2d 948, 954 (Miss. 2002)).

¶88.    Finally, United asserts the trial court erred in failing to grant an ore tenus, unnumbered instruction submitted by it, which stated:

> If you find from a preponderance of the credible evidence that the defendant United American tendered the refund of premium check and that Plaintiff Natalie Merrill knew at the time of tender that the insurance company

defendant United American had no intention of paying the claim, and you find from a preponderance of the credible evidence that Plaintiff Natalie Merrill thereafter negotiated and cashed the check with knowledge that defendant United American had tendered the check and that Plaintiff Natalie Merrill fully understood that United American at the time had no intention of paying on the policy, then your verdict shall be for defendant United American.

¶89. The trial judge ruled this instruction was covered "by the waiver and/or accord and satisfaction instructions. So, this would merely be cumulative." After reviewing DUA-9, the given instruction on accord and satisfaction, the Court finds that the instruction at issue is virtually identical to DUA-9 and would render the same result. DUA-9 gives the correct statement of law pursuant to this Court's decision in *Medlin,* 889 So. 2d at 498 (Miss. 2004). The trial court correctly stated the giving of the instruction at issue would be cumulative.

¶90. Accordingly, we find that the instructions given by the trial court, taken as a whole, were proper.

### C.    Did the trial court err in certain evidentiary rulings?

¶91. "Our well-established standard of review for the trial court's admission or suppression of evidence, including expert testimony, is abuse of discretion. We give great deference to the discretion of the trial judge." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003). "Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *Tunica County v. Matthews*, 926 So. 2d 209, 212-213 (Miss. 2006) (citations omitted).

¶92. After review of Natalie's brief, the Court discovered that while offering pertinent cites to the record, Natalie did not offer a single authority in her response to United's argument on erroneous evidentiary rulings. This omission was further recognized in United's reply

30

brief. Due to Natalie's failure to cite any legal authority, this Court is not bound to consider her argument on this issue. "This issue is not properly before the Court pursuant to M.R.A.P 28(a)(6) which states that an argument in the appellate's brief 'shall contain the contentions of appellant with respect to the issue presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied upon.'" ***Conley v. State***, 790 So. 2d 773, 784 (Miss. 2001) (citation omitted). However, for informational purposes, we will address the arguments on this issue.

¶93.    United submits that the trial court should not have allowed the deposition testimony of two employees of United, wherein they testified to United's obligations regarding the policy. United submits the following portions of testimony were allowed in error:

1)    United employee, Sam Smith, testified that Robert could not make a misrepresentation by signing the application if he had never been told that he had been treated for congestive heart failure.

2)    United employee, Sandra Whitaker, testified that the only representation Robert made through the application was that the statements and answers therein were full, complete and true to the best of Robert's knowledge, and that United did not require Robert to ask his physicians whether he had any of the conditions listed on the application.

¶94.    United argues this testimony wrongfully placed the burden on it to show that Robert made an intentional misrepresentation and that Smith was being asked to define material misrepresentation under Mississippi law. Further, United argues this testimony shows United was not entitled to cancel the policy unless it proved Robert *knew* he had congestive heart failure. Upon ruling on United's objection to this testimony, the trial judge stated that while Natalie could not ask these witnesses' opinions on misrepresentation under Mississippi law, he was taking the answers of these witnesses "to be couched in terms of policies – insurance

31

policy, nomenclature, and the company definitions. . . ." The trial judge further ruled these employees should be able to testify to language which their company drafted.

¶95. Although this Court has stated, "the interpretation of insurance policy language is a question of law," the trial judge was correct that this testimony merely spoke to Robert's agreement to the policy which United drafted. The testimony did not attempt to interpret the actual language of the policy. The trial judge did not abuse his discretion in allowing this testimony.

¶96. United further objected to the portion of testimony wherein Triplett was asked, "Do you have an opinion about whether or not United American should have paid Ms. Merrill's claims?" Triplett answered, "I think they should have paid the lady." At trial, United objected that this was a legal conclusion and that Triplett should not be able "testify that we owe the claim." The trial judge overruled the objection and stated her answer was not a legal conclusion, but a question of standards in the insurance business. The trial judge was correct in his ruling. Triplett was correctly allowed to state her *opinion* on this matter pursuant to Mississippi Rules of Evidence 701 and 704 and their Comments.

¶97. Additionally, United objected to the testimony of Triplett wherein she stated: 1) that she did not tell the Merrills about any contestability clause in the policy; 2) that United did not tell Triplett there was a contestability clause in the policy; and 3) that Triplett thought it would have been important for the Merrills to know about the contestability clause in the policy. United argues that knowledge of the contestability clause should have been imputed to the Merrills as "it is the law that a person is bound by the contract, the documents that they sign." However, the Merrills did not have this information at the time they applied, as they

were not issued the policy simultaneously with their application. *See **Stephens v. Equitable Life Assur. Soc. of the US,*** 850 So. 2d 78, 83 (Miss. 2003)). This might be true as applied to the Merrills after they received the policy, but not as to Triplett. Triplett is an agent of United and pursuant to this Court's holding in ***Hollins,*** United is bound by Triplett acting within the scope of her authority. *See **Hollins,*** 830 So. 2d at 1237. The trial judge did not abuse his discretion by allowing this testimony.

¶98.    United further asserts Triplett should not have been allowed to testify that she was told by Parker and Associates that a claim would be paid in thirty days and that she relayed this information to the Merrills. In its appellate brief and argument to the trial court, United simply states there are relevance and hearsay violations pursuant to Mississippi Rules of Evidence 401, 403, and 801, but fails to give any explanation as to why. United additionally reiterates its argument that the terms and conditions of the policy were clear and that the Merrills were subject to these terms. However, as an agent for United, United is bound by the information Triplett gave regarding the policy. *See **Hollins,*** 830 So.2d at 1237.  The trial judge did not abuse his discretion by allowing this testimony.

¶99.    Over the objection of United, Triplett was further allowed to testify:  1) that Parker and Associates was involved in a dishonest scheme because she did not receive any training; 2) that she was allowed to go out "foot free and loose," but was accountable when "things happened;" and 3) that she was exploited and pushed to bring in money. United argues that pursuant to M.R.E. 401 and 403, the value of this testimony was substantially outweighed by the prejudice to United and that it was not relevant to the issues presented at trial. The questions which elicited this testimony from Triplett were asked by counsel for United.

33

Although United argues Parker and Associates was responsible for training Triplett, Triplett was an agent for United and it was responsible for her actions. The training of agents who will solicit answers from prospective insureds which may result in material misrepresentations, is pertinent to the resolution of the issues of this case and meets the requirements of M.R.E. 701 and its comment. The trial judge did not abuse his discretion by allowing the preceding testimony.

¶100.  This Court has stated, "The reviewing court may reverse a case only if, 'the admission or exclusion of evidence. . . results in prejudice and harm or adversely affects a substantial right of a party.'" *Blake v. Clein*, 903 So. 2d 710, 723 (Miss. 2005) (quoting *K-Mart Corp. v. Hardy*, 735 So. 2d 975, 983 (Miss. 1999)). Accordingly, the trial judge did not abuse his discretion when excluding these records.

### III.    Did the trial court err in submitting extracontractual/ punitive damages to the jury?

¶101.  "An abuse of discretion standard is used when this Court reviews the trial court's decision on whether a case warrants punitive damages to be considered by the trier of fact." *Bradfield v. Schwartz,* 936 So. 2d 931, 936 (Miss. 2006) (citations omitted).

> As a general rule, exemplary or punitive damages are 'added damages' and are in addition to the actual or compensatory damages due because of an injury or wrong. The kind of wrongs to which punitive damages are applicable are those, which besides the violation of a right or the actual damages sustained, import insult, fraud, or oppression and not merely injuries, but injuries inflicted in the spirit of wanton disregard for the rights of others.

*Id.* (citations omitted).

¶102.  Pursuant to Miss. Code Ann. Sect. 11-1-65, this trial was bifurcated, and the trial judge submitted the punitive damages issue to the jury after a finding for compensatory

damages. The jury awarded Natalie $900,000 in punitive damages. Citing **State Farm Automobile Insurance v. Campbell,** 123 S.Ct. 1513, 538 U.S. 408, 155 L.Ed.2d 585 (2003), the trial court found this award to be proper after remittitur, as this amount did not exceed nine times Natalie's compensatory damages, the guideline suggested in **Campbell**.

¶103. United argues the trial court erred in submitting the punitive damages issue to the jury for two reasons. The first of these is that Natalie was denied her motion for directed verdict. In its brief, United relies on this Court's holding in **State Farm Mutual Auto Insurance Co. v. Grimes**, wherein this Court held that after denial of a motion for directed verdict on a contract claim, this denial "generally indicates that a punitive damage instruction should not have been submitted." **State Farm Mut. Auto Ins. Co. v. Grimes**, 722 So. 2d 637, 640 (Miss. 1998). Nevertheless, United failed to cite the very next sentence which held, "However, this Court has, in recent cases, backed away from a blanket holding that a punitive damages instruction should be not submitted to the jury if a directed verdict was denied on the underlying contract." **Grimes** further held, "This Court in [**Dixie Insurance v.**] **Mooneyhan**, thus noted that a judge may validly conclude that an insurer lacked an arguable reason to deny the claim and that it acted in bad faith *notwithstanding the fact that he refused a directed verdict on the underlying contract claim."* **Id.** at 640 (emphasis added). Accordingly, United's argument that the trial judge erred in submitting the punitive damages issue to the jury due to the denial of the motion for directed verdict is without merit.

¶104. This Court has held,

> The issue of punitive damages should not be submitted to the jury unless the
> trial court determines that there are jury issues with regard to whether:

35

> 1) The insurer lacked an arguable or legitimate basis for denying the claim, and,
>
> 2) The insurer committed a wilful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.

*Hollins,* 830 So. 2d at 1239 (citations omitted).

¶105. In *Windmon v. Marshall,* this Court, citing *Murphree v. Federal Insurance Co.,* held, "[I]f there is a finding that there was a reasonable arguable basis to deny the claim then the [appellant] is not entitled to have the jury consider any bad faith award against the insurance company."*Windmon v. Marshall,* 926 So. 2d 867, 872 (Miss. 2006) (citing *Murphree v. Federal Ins. Co.,* 707 So. 2d 523, 529 (Miss. 1997)). United claims its arguable basis for denial is the dispositive issue on which to decide that the trial court erred in its decision to submit punitive/extracontractual damages to the jury.

¶106. "Where an insurance carrier denies or delays payment of a valid claim, punitive damages will not lie if the carrier has a reasonable cause for such denial or delay." *Murphree,* 707 So. 2d at 529. United unpersuasively argues it had an arguable basis for denying the claim. United submits that at trial, it showed that question six on the policy should have been answered "yes" as to congestive heart failure. United submits it provided proof of this through two cardiologists (one of whom was the medical director for United) who testified, based on the medical records obtained by United, that Robert was treated for congestive heart failure in the three years preceding the application. United argued that the claim file showed Robert's family doctor treated Robert for ischemic cardiomyopathy and coronary artery disease, although neither condition is included in the application questionaire.

36

¶107. Natalie argues, to the contrary, that United did not have an arguable basis for denying the claim based on this Court's holding in *Williams*. In *Williams,* the application form was filled out by the agent for Andrew Jackson and the application did not include a heart condition which Williams stated he disclosed to the agent. Further, Williams claimed the agent misrepresented the provisions of the policy to him. *See Williams,* 566 So. 2d at 1187. *Williams* held, "Such misrepresentations created a jury issue of whether Andrew Jackson's denial was arguable." *Id.* Natalie asserts her facts are analogous to the facts in *Williams* because Robert revealed to Triplett, who filled out the application, that he had had bypass surgery and even showed her his scar. Further, Triplett failed to include this information on Robert's application. This Court has held, "We have not hesitated to allow jury consideration of punitive damages in cases where an insurer denied a claim because of a material misrepresentation made by an agent." *Lewis v. Equity Life,* 637 So. 2d 183, 186 (Miss. 1994).

¶108. Natalie further disputes the evidence put forth by United to claim it had an arguable basis for denial. Natalie submits that, although United's medical director testified Robert's medical records indicated he had congestive heart failure, "none of the documents which it based its denial on contained the words congestive heart failure, and that none of those documents state anywhere, nor contain any evidence, that Mr. Merrill was told by a doctor or anyone else that he had or had been treated for congestive heart failure."

¶109. These arguments by the parties clearly presented a factual dispute for which a jury determination was necessary and proper. "[W]here the parties dispute the existence and legitimacy of the carrier's reason for delay or denial, these issues are ones of material fact,

37

and the plaintiff is entitled to have a jury pass upon his claim for punitive damages if reasonable minds could differ as to the legitimacy of the carrier's reason." *Murphree,* 707 So. 2d at 529 (citations omitted). Thus, the first requirement for submitting punitive damages to the jury, pursuant to *Hollins*, was met. *See Hollins,* 830 So. 2d at 1239.

¶110.  As to the second prong stated in *Hollins,* United provides only a citation and states it did not act with gross negligence or reckless disregard for Natalie's rights, but provides no argument.

¶111.  Natalie submits to this Court that United acted with gross negligence and reckless disregard for her rights, as United did not conduct a proper investigation. *Lewis* held, "'[T]he denial of a claim without proper investigation may give rise to punitive damages.'" *Lewis,* 637 So. 2d at 187 (citing *Crenshaw,* 483 So. 2d at 276). "Proper investigation, the *Crenshaw* court held, means obtaining 'all available medical information relevant to [the policyholder's] claim.'" *Id.* (citing *Crenshaw,* 483 So. 2d at 272). United failed to undertake a full investigation of Natalie's claim until after it was denied. Furthermore, as recommended by United's legal department, United failed to obtain a statement from Triplett, as United attempted to contact her only once by phone.  Natalie also argues the delay of the claim denial for 278 days shows negligence and reckless disregard for her rights.  Lastly, Natalie states United acted recklessly when it sent two representatives to her home to collect premiums *after* her claim had been denied. Natalie stated it caused her to be upset when two men from United knocked on her door and upon Natalie asking them to leave, they presented to her a card from United which stated she still owed the $54.00 a month premiums.

¶112. Natalie submits that the amount of damages awarded was proper. United argues that extracontractual/punitive damages should not have been submitted to the jury *at all.* However, United did not contest the *amount* of damages awarded, either in its pleadings, or during oral argument before this Court.

¶113. Mississippi law recognizes four factors to be applied in determining the amount of punitive damages:

> 1) The amount should punish the insurer and deter it from engaging in similar actions in the future.
> 2) The amount should serve as a deterrent for others.
> 3) The amount should account for the insurer's financial worth.
> 4) The amount should compensate the plaintiff for her public service in holding the insurer accountable.

*Williams,* 566 So. 2d at 1190.

¶114. Natalie argues all elements have been met, that United should be punished for its actions, and that this award will be for the public good. Natalie further states this award is sufficient to punish United, and to deter it from taking similar actions, and that it compensates her for her public service in holding United accountable. Further, United's net worth was shown to be $184,638,000 after having paid dividends to its parent company of $128,000,000.

¶115. This award is less than five times the amount of compensatory damages and is less than one-half of one percent of United's net worth. Further, as stated by the trial judge in his opinion, this award is consistent with this Court's holding in *Hollins,* 830 So. 2d at 1241-42, and with the holding of the United States Supreme Court in *State Farm v. Campbell. Campbell* held, "[C]ourts must ensure that the measure of punishment is both reasonable and

39

proportionate to the amount of harm to the plaintiff and to the general damages recovered."

***State Farm Mut. Auto. Ins. Co. v. Campbell***, 538 U.S. at 426.

¶116. "Measurement of the amount is solely fettered to the jury's discretion." ***Williams,*** 566 So. 2d at 1190. Furthermore, "We will disturb a jury verdict on appeal only if it 'is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" ***Burr v. Miss. Baptist Med. Ctr***., 909 So. 2d 721, 730 (Miss. 2005).

¶117. Additionally, "[w]here punitive damages are awarded by the jury, attorney's fees are justified. The reasonableness of an attorney's fee award is determined by reference to the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct.***" Miss. Power & Light Co. v. Cook***, 832 So. 2d 474, 486 (Miss. 2002) (internal citations omitted). The attorney's fees awarded to Natalie were reasonable, as stipulated by United, without waiving its argument that attorney's fees should not have been considered by the jury at all.

¶118. The final judgment comports with the law of this state and that of the United States, and was supported by substantial evidence.

## CONCLUSION

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers could arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over evaluation, processing and denial of claims. For these reasons, a duty is imposed that '[an] indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business.'

40

*Williams,* 566 So. 2d at 1189 (Miss. 1990).

¶119. After review of the record and the evidence presented, the Court finds United failed to meet the duties the law imposes. Finally, no errors occurred during trial which prejudiced the rights of United.

¶120. Lastly, a duly empaneled jury rendered a verdict in this case. This Court has held, "that the jury's verdict may be interfered with if it is found 'arbitrary or unreasonable' or 'against the overwhelming weight of the evidence. . . .'" *Crenshaw,* 483 So. 2d at 278. The verdict in this case meets neither of these descriptions and should be upheld.

¶121. **AFFIRMED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, GRAVES, DICKINSON, AND LAMAR, JJ., CONCUR.**